Matthew T. Christensen, ISB: 7213
Chad R. Moody, ISB: 9946
JOHNSON MAY
199 N. Capitol Blvd., Ste. 200
Boise, Idaho 83702
Telephone: (208) 384-8588
Facsimile:  (208) 629-2157
Email: mtc@johnsonmaylaw.com
        crm@johnsonmaylaw.com

*Attorney for Plaintiff*

UNITED STATES BANKRUPTCY COURT

DISTRICT OF IDAHO

| | |
|---|---|
| In re:<br><br>IDAHO HEALTH DATA EXCHANGE, INC.,<br><br>Debtor. | Case No. 22-00355-JMM<br><br>Chapter 11<br>(Subchapter V) |
| IDAHO HEALTH DATA EXCHANGE, INC.,<br>an Idaho corporation,<br><br>Plaintiff,<br><br>vs.<br><br>CUREOUS INNOVATIONS, INC., a<br>Delaware corporation; ADA COUNTY<br>DISTRICT COURT, a political subdivision of<br>the State of Idaho,<br><br>Defendants. | Adversary No. 22-_____-JMM<br><br>**COMPLAINT TO AVOID PREFERENCE TRANSFERS AND RECOVER FUNDS AND OBJECT TO CLAIM** |

The Plaintiff, Idaho Health Data Exchange, Inc. ("IHDE"), by and through its counsel of

record, Johnson May, complains and alleges as follows:

## NATURE OF ACTION

1.      In this Adversary Proceeding, the Debtor seeks an order avoiding preference

transfer pursuant to 11 U.S.C. §§ 547 and 550, the funds seized by Cureous Innovations, Inc.

COMPLAINT TO AVOID PREFERENCE TRANSFER – Page 1

("Cureous"), a creditor of IDHE, pursuant to that certain Writ of Attachment issued on or around

May 27, 2022, in Ada County Case No. CV01-21-15209 (the "Ada County Case"), which allowed

the Ada County Sheriff to seize certain funds in the amount of Four Hundred Sixty-Nine Thousand

Seven Hundred Sixty-Seven and 83/100 Dollars ($469,767.83).  The funds are currently being

held by the Ada County District Court.  Additionally, the Debtor objects to the Proof of Claim

filed by Cureous in this bankruptcy case.

## PARTIES

2.       Plaintiff, IHDE is the Debtor of the above-referenced bankruptcy proceeding.

3.       Defendant Cureous is a Delaware corporation, existing under the laws of the State

of Delaware, with its principal place of business located in New Gloucester, Maine. Cureous is a

creditor of the Debtor and has filed a Proof of Claim in the bankruptcy case.

4.       Defendant Ada County District Court is a political subdivision of the State of Idaho,

located in Boise, Ada County, Idaho.  The Ada County District Court currently holds the funds

which are the subject of the preference claim outlined below.

## JURISDICTION AND VENUE

5.       This Adversary Proceeding arises under Title 11 of the United States Code and

arises in or is related to the captioned Chapter 11 case now pending in the United States Bankruptcy

Court of the District of Idaho, as Case Number 22-00355-JMM.

6.       This Court has jurisdiction over this adversary proceeding pursuant to the

provisions of 11 U.S.C. § 105 and 28 U.S.C. §§ 157, 2201 and 1334, all pursuant to the standard

order of reference entered in this District.

7.       IHDE asserts the claims being pursued in this Adversary Proceeding are "core

proceedings" pursuant to 28 U.S.C. § 157 and related authority. Nevertheless, to the extent the

claims pursued herein are not core proceedings, IDHE expressly consents to the Bankruptcy Court

entering final orders and judgment on all claims in this proceeding.

8.      Venue is proper under 28 U.S.C. § 1409(a).

9.      This proceeding is brought pursuant to 11 U.S.C. § 105, and Rule 7001 of the

Federal Rules of Bankruptcy Procedure.

## FACTUAL BACKGROUND

### Contractual Relationship between IHDE and Cureous

10.      Cureous is healthcare technology and data company that licenses and provides

subscriptions for interoperability software.

11.      IHDE is a state designated internet-based health information exchange ("HIE")

designed to provide statewide coordination of health care in Idaho.

12.      IHDE and Cureous executed a Master Services Agreement ("MSA"), effective

December 18, 2019. A copy of that MSA is attached here as ***Exhibit 1***.

13.      The MSA contained the general terms and conditions that governed the products and

services Cureous would provide to IHDE.  For each specific product or service, the parties agreed to

enter into a Statement of Work ("SOW").

14.      SOW 2 governed IHDE's license rights to TermAtlas and Smart HL7 software and

support services for one year. A copy of SOW 2 is attached here as ***Exhibit 2***.

15.      The license fee for the software and services provided under SOW 2 was $250,000.00

per year.  IHDE signed SOW 2, representing its agreement with Cureous for a one-year license for

TermAtlas and Smart HL7.

16.      SOW 3 governed Cureous's provision of infrastructure as a service ("IaaS Service") to

host TermAtlas and Smart HL7 for a year at $15,000 per month (or $180,000 per year).  A copy of

SOW 3 is attached here as ***Exhibit 3***.

17.     IHDE signed SOW 3, representing its agreement with Cureous for one year of Iaas Service.

18.     The parties contemplated entering into amendments to SOWs 2 and 3, but no amendments were ever signed or finally agreed to.

19.     IHDE paid Cureous $458,500 for the licenses and services provided under SOWs 2 and 3.

20.     IHDE did not use Cureous's TermAtlas or Smart HL7 software or support services or Cureous's Iaas Services beyond the initial first-year term of SOWs 2 and 3.


**Ada County Case litigation**

21.     On or around September 29, 2021, Cureous filed a complaint against IHDE in the Ada County case ("Cureous Complaint"). The Cureous Complaint sets forth three causes of action (1) Breach of Contract; (2) Breach of Implied Covenants of Good Faith and Fair Dealing; and (3) Fraud.

22.     IHDE filed its answer to the Cureous Complaint on November 1, 2021.

23.     On or around December 8, 2021, Cureous filed an Application for Prejudgment Writ of Attachment in the Ada County Case.  Ultimately, the Ada County court granted this request on May 19, 2022.  The Ada County court's order granting the request for Prejudgment Writ of Attachment required the Ada County Sheriff to turn over, to the Ada County court, any funds seized by the Sheriff.

24.     A Prejudgment Writ of Attachment was issued by the Ada County court on or around May 19, 2022, for the amount of $788,544.00 ("Attachment").

25.     After May 19, 2022, the Ada County Sheriff seized $408,223.17 from IHDE's bank account at D.L. Evans Bank. The Ada County Sheriff later seized an additional $61,544.66 from

COMPLAINT TO AVOID PREFERENCE TRANSFER – Page 4

the bank account.  The Ada County Sheriff remitted all seized funds to the Ada County court, where funds currently remain.

26.    On August 12, 2022 ("Petition Date"), a Chapter 11 Petition was filed by IHDE, Case No. 22-00355-JMM ("Bankruptcy Case").

27.    The Sheriff's seizure of funds, and turnover of the funds to the Ada County Court was a transfer of assets of IHDE made within ninety (90) days of the Petition Date.

## COUNT 1
## AVOIDANCE OF PREFERENCE TRANSFERS (11 U.S.C. 547)

28.    IHDE reasserts all of the foregoing paragraphs as if fully set forth herein.

29.    The funds seized by the Ada County Sheriff (on behalf of Cureous),  pursuant to the Writ of Attachment, were seized within ninety (90) days prior to the Petition Date.

30.    The funds seized pursuant to the Writ of Attachment was a "transfer" or "transfers" within the meaning of 11 U.S.C. §§ 101(31) and 547(b) ("Transfers").

31.    The Transfers consisted of transfers of property in which the Debtor had an interest.

32.    At the time the funds were seized and paid to the Ada County court, Cureous had asserted an antecedent owed by IHDE.

33.    Transfer of the funds to (or on behalf of) Cureous was made for or on account of unsecured and undetermined (and disputed) debts owed by IHDE to Cureous prior to a final judgment being entered in Ada County Case No. CV01-21-15209.

34.    At the time the Transfers were made, IHDE was not paying it's outstanding debts when they became due.

35.    Alternatively, at the time the Transfers were made, the value of IHDE's assets did not exceed the amount of its liabilities.

36.    At the time the Transfers were made, IHDE was insolvent.

37.    To the extent it was a creditor of IHDE at the time of the Transfers, Cureous was an unsecured creditor.

38.    The Transfers enabled Cureous (an unsecured disputed creditor) to receive (i) more than it would receive under Chapter 7 of the Bankruptcy Code; (ii) if the Transfers had not been made, and (iii) had Cureous received payment of such debts to the extent provided by Chapter 7 of the Bankruptcy Code as an unsecured creditor.

39.    As a direct and proximate result of the foregoing, IHDE is entitled to an order avoiding and preserving the Transfers for the benefit of the Debtor's bankruptcy estate, pursuant to 11 U.S.C. §§ 547, 550, and 551.  Further, IHDE is entitled to an order requiring the Ada County court turn over the transferred funds to the Debtor.

## COUNT 2
## OBJECTION TO PROOF OF CLAIM

40.    IHDE reasserts all of the foregoing paragraphs as if fully set forth herein.

41.    Cureous has filed Claim No. 2 in the Debtor's bankruptcy case and claimed certain amounts owed by IHDE, as well as a security interest in the seized funds.

42.    IHDE requests the Court determine the validity of Cureous' claims against the Debtor and deny the same.

43.    Further, in its Proof of Claim, Cureous has claimed a lien on the seized funds.  For the reasons outlined in the preference transfer claim above, IHDE further requests the Court determine the validity and extent of any lien claimed by Cureous, and deny the same.

## ATTORNEY FEES AND COSTS

44.    IHDE has incurred costs and expenses to defend the Ada County case and pursue these claims, including attorney fees.  IHDE is entitled to an award of attorney fees and expenses

pursuant to the parties' agreement and/or applicable Idaho law for the costs and expenses of pursuing this lawsuit and defending the Ada County case.

## PRAYER FOR RELIEF

WHEREFORE, IHDE prays for relief against Cureous and the Ada County District Court as follows:

1.     For an order, pursuant to 11 U.S.C. §§ 547 and 550, avoiding and recovering for the bankruptcy estate the funds in the amount of $469,767.83, as preference transfers; and

2.     For an order disallowing any claim by Cureous against the Debtor and an order disallowing any lien held by Cureous against any property of the Debtor or bankruptcy estate;

3.     For an award of reasonable attorney fees and costs incurred in pursuing this lawsuit and defending the Ada County case; and

4.     For such other relief as to the Court may seem just and equitable.

DATED this 7th day of November, 2022.

                                    /s/ Matt Christensen
                                    _____
                                    MATTHEW T. CHRISTENSEN
                                    Attorney for Debtor in Possession

EXHIBIT 1

# IDAHO HEALTH DATA EXCHANGE
## MASTER SERVICES AGREEMENT

This Master Services Agreement ("Agreement") is entered into as of December 18, 2019 ("Effective Date") by and between Idaho Health Data Exchange, an Idaho nonprofit corporation having a principal place of business at P.O. Box 6978 Boise, ID 83707 ("IHDE") and Cureous Innovations a Delaware corporation, having a principal place of business at 60 Pineland Drive Portland Hall, Suite 230 New Gloucester, ME 04260 ("Contractor") for the provision of services in accordance with the following terms and conditions. IHDE and Contractor may be referred to in this Agreement individually as a "Party" and together as the "Parties."

**WHEREAS,** the Parties desire to enter into this Agreement whereby Contractor will provide services to IHDE including HIE infrastructure and software review and assessment, installation of TermAtlas™ software on IHDE's third party service provider's system and other professional services on an ongoing basis ("Services").

**NOW, THEREFORE,** in consideration of these presents and the mutual promises contained herein, the Parties hereby agree as follows:

1. **Purpose.** During the term of this Agreement, Contractor shall provide to IHDE the Services described in Attachment 1 Statement of Work ("SOW"). Additional SOWs may be added to this Agreement by mutual written agreement of the Parties. Attachment 1 and any subsequent SOWs contains terms and conditions applicable to the work being performed. In the case of a conflict between this Agreement and a SOW, the terms of the SOW shall control. SOW terms apply to the relevant scope of work described in the SOW and do not modify the terms of other SOWs. This Agreement may be managed and administered by Capitol Health Associates ("CHA") via the CHA - IHDE Master Agreement in relation to IHDE's contracts with the State of Idaho or by other entities as designated in writing by IHDE ("Designate").

2. **Term and Termination.**

   a. Term. The Term of this Agreement ("Term") shall commence on the Effective Date and shall continue in full force for four 4 years (the "Initial Term"), unless sooner terminated in accordance with this Section 2. Thereafter, the term of this Agreement may renew for two separate successive periods of one (1) year each (each such period, a "Renewal Term"; together with the Initial Term, the "Term") upon written notice by IHDE to Contractor at least thirty (30) days prior to the end of the Initial Term or the then-current Renewal Term.

   b. Termination.

      Termination for Cause. Either Party may terminate this Contract upon written notice to the other Party in the event:

1

1. The other Party materially breaches this Agreement and does not cure such breach within thirty (30) days of written notice.

2. The other Party becomes insolvent, makes an assignment for the benefit of its creditors, a receiver is appointed or a petition of bankruptcy is filed with respect to the Party and is not dismissed within ninety (90) days.

IHDE may immediately terminate this Agreement, with notice to Contractor, to the extent (A) Contractor violates any applicable federal, state, or local law, rule, or regulation (collectively, "Applicable Laws") and/or acts or fails to act in a manner which causes IHDE to be in violation of Applicable Laws or (B) Contractor breaches any material term or condition of this Agreement three (3) or more times in any given twelve (12) month period, regardless of whether said breaches have been timely cured by the Contractor.

Termination for Lack of State Funding. IHDE receives funding through appropriations from the State of Idaho (the "State"). In the event this Agreement extends into more than one fiscal year of the State (July 1 to June 30), and if appropriations are insufficient to support the fee and payment terms of this Agreement or a SOW, IHDE may terminate this Agreement at the end of the fiscal year, or otherwise upon the expiration of existing appropriation authority upon thirty (30) days prior written notice. In the event that this Agreement or a SOW is funded in whole or part by a federal grant which funds become unavailable or reduced, IDHE may suspend or cancel this Agreement upon thirty (30) days prior written notice. Contractor shall be compensated for services performed and costs incurred prior to the date of termination.

c. Effect of Termination. Upon the expiration or termination of this Agreement Contractor will immediately return all materials owned by IHDE and provided to Contractor in accordance with Section 5. All fees, if any, which are outstanding will be immediately due and payable by IHDE to Contractor.

3. **Payment and Invoicing.**

a. Fees. IHDE hereby engages Contractor to timely complete work as described in the attached SOW(s). IHDE will compensate Contractor for all work services performed in accordance with the terms and conditions of this Agreement and the applicable terms in the corresponding SOW (collectively, "Fees"). The total maximum amount payable to Contractor shall not exceed the specific dollar amount agreed upon for each SOW unless agreed to by mutual written consent of the Parties. The maximum amount payable under any SOW is not intended as a guaranteed amount. Contractor shall be paid for products delivered or Services performed as specified in the applicable SOW.

b. Expenses. IHDE shall reimburse Contractor for any ordinary and necessary business expenses and other out-of-pocket expenses incurred by Contractor

2

hereunder. Such expenses shall be itemized as required by IHDE or its Designate in accordance with the applicable provisions of the Internal Revenue Code of 1986, as amended and the Treasury Regulations promulgated thereunder. Contractor will invoice IHDE or its Designate monthly for such expenses.

c. Invoicing. By the 10th day of each month during the term of the Agreement, the Contractor will provide IHDE with an invoice according to the terms set forth in the SOW during the preceding month. Invoices shall be submitted electronically on a monthly basis to Idaho Health Data Exchange – Attention to – Joyce Alexander with copy to Jesse Meldru Director of Finance

jalexander@idahohde.org   jmeldru@idahohde.org

d. Payments. IHDE shall pay Contractor within twenty-one (21) days after receipt of Contractor invoice.

4. **Contractor Status.** IHDE and Contractor agree that Contractor is an independent contractor, and not an employee of IHDE. Accordingly:

   a. Taxes and Fees. Contractor will be solely responsible for paying all necessary employment taxes for its personnel and to report employees' income and withhold all required taxes from that income, as may be required by law.

   b. No Authority. Contractor has no authority to enter into any contracts or to other wise act on behalf of IHDE, and Contractor will not take any action that might lead third parties to believe it has the right to do so.

   c. Services to Third Parties. IHDE acknowledges that Contractor offers services similar to those offered under this Agreement to other persons or entities. Unless stated otherwise in this Agreement, Contractor may continue to offer and provide services similar to those offered under this Agreement to other persons or entities during the term of this Agreement.

5. **Ownership of Work Product.** Any and all rights in and to all Work Product created, conceived, prepared, made, discovered, or produced by Contractor in connection with the performance of this Agreement, including but not limited to patents, copyrights, trademarks, and any other intellectual property rights ("Work Product"), will be the exclusive property of IHDE. However, Work Product does not include any intellectual property including but not limited to know-how, trade secrets, inventions, copyrights, trademarks, patents, patent applications, algorithms, techniques, processes, methods, formulas, research, product or service ideas or plans or software codes and designs that are owned or controlled by the Contractor prior to or independent of the provision of Contractor's Services to IHDE or authored, developed, conceived or first actually reduced to practice contemporaneously with the provision of Contractor's Services to IHDE but not arising from the performance of work described in the SOW. ("Background Intellectual Property"). Contractor retains all right, title, and interest in and to any Background Intellectual Property. However,

3

to the extent Background Intellectual Property is incorporated into Contractor's Services to IHDE, Contractor grants to IHDE a non-exclusive, non-transferable license to use the Background Intellectual Property solely for IHDE's internal use and consistent with the purpose described in the SOW and solely for use in connection with said SOW. Except for the foregoing license, Contractor reserves all rights, title, and interest in and to its Background Intellectual Property. Notwithstanding the foregoing, IHDE may not exploit or use the Background Intellectual Property separate from the Services or reverse engineer any Background Intellectual Property constituting software.

At the termination of this Agreement or upon request of IHDE, Contractor shall deliver or return all copies of the Work Product together with any other materials furnished by IHDE provided that Contractor may retain a single copy of the Work Product for Contractor's internal reference purposes.

6. **Confidential Information**.  From time to time during the term of this Agreement, either Party may disclose or make available to the other Party information about its business affairs, products, confidential intellectual property, trade secrets, third-party confidential information, and other sensitive or proprietary information, whether orally or in written, electronic, or other form or media and whether or not marked, designated or otherwise identified as "confidential" (collectively, "Confidential Information").

Confidential Information does not include information that, at the time of disclosure is: (a) in the public domain; (b) known to the receiving Party at the time of disclosure; (c) rightfully obtained by the receiving Party on a non-confidential basis from a third party; or (d) independently developed by the receiving Party.

The receiving Party shall not disclose the disclosing Party's Confidential Information to any person or entity, except to the receiving Party's employees, agents, subcontractors, and the State of Idaho who have a need to know the Confidential Information for the receiving Party to exercise its rights or perform its obligations hereunder. The receiving Party shall obtain and maintain a written agreement with each person to whom the receiving Party discloses Confidential Information pursuant to which such person agrees to be bound by the same restrictions, terms and conditions that apply to the receiving Party pursuant to this Agreement.

Notwithstanding the foregoing, each Party may disclose Confidential Information to the limited extent required (i) in order to comply with the order of a court or other governmental body, or as otherwise necessary to comply with applicable law, provided that the Party making the disclosure pursuant to the order shall first have given written notice to the other Party and made a reasonable effort to obtain a protective order; or (ii) to establish a Party's rights under this Agreement, including to make required court filings.

4

On the expiration or termination of this Agreement, the receiving Party shall promptly return to the disclosing Party all copies, whether in written, electronic, or other form or media, of the disclosing Party's Confidential Information, or destroy all such copies and certify in writing to the disclosing Party that such Confidential Information has been destroyed.

Each Party's obligations of non-disclosure with regard to Confidential Information are effective as of the Effective Date and will expire five (5) years from the date first disclosed to the receiving Party; provided, however, with respect to any Confidential Information that constitutes a trade secret (as determined under applicable law), such obligations of non-disclosure will survive the termination or expiration of this Agreement for as long as such Confidential Information remains subject to trade secret protection under applicable law.

Nothing in this Section shall be deemed to alter, lessen or minimize the standards and requirements of the Business Associate Agreement (BAA) between the Parties. For the avoidance of doubt, the BAA shall govern the treatment of protected health information (PHI). Upon the prior review and written consent of IHDE, Contractor may publish articles or make presentations regarding Contractor's work for IHDE.

7. **Indemnification Contractor.**  Contractor will indemnify, defend, and hold harmless IHDE, its officers, directors, employees, and agents from and against any and all loss, liability, and costs including, without limitation, reasonable attorney fees arising out of or related to any claim, action or proceeding against IHDE regarding (1) any grossly negligent, reckless, or willful act or omission of Contractor or any of the Contractor's employees or agents in the performance of Services under this Agreement; or (2) a breach of any warranty or representation set forth herein of this Agreement; or (3) any successful claim that the Background Intellectual Property infringes a party's copyright, trademark, trade secret, or patent as a result of IHDE's use of the Work Product despite Contractor's best effort to avoid said infringement. IHDE will: (i) give Contractor prompt written notice of the claim; and (ii) allow Contractor to control, and fully cooperate with Contractor (at Contractor's sole expense) in the defense and all related negotiations.  Contractor will not enter into any stipulated judgment or settlement that purports to bind IHDE without IHDE's express written authorization, which will not be unreasonably withheld or delayed.

Notwithstanding the foregoing, Contractor will have no indemnity obligation for infringement claims arising from (i) use of the Background Intellectual Property in excess of the rights granted in this Agreement; (ii) use of the Background Intellectual Property in combination with software and/or hardware that is not approved or provided by Contractor; or (iii) IHDE's failure to implement an update or enhancement to the Background Intellectual Property, provided Contractor provides the update or enhancement at no additional charge to IHDE and provides IHDE with written notice that implementing the update or enhancement would avoid the infringement.

8. **Indemnification IHDE.**  IHDE will defend, indemnify, and hold harmless Contractor, its officers, directors, employees and agents from and against any and all loss, liability, and costs including without limitation, reasonable attorney fees arising out of or related to any claim, action or proceeding against Contractor regarding (1) any grossly negligent, reckless, or willful act or omission of IHDE or any of IHDE's employees or agents in the performance of its obligations under this Agreement; or (2) a breach of any warranty or representation set forth herein of this Agreement, including the payment of all amounts that a court awards or that IHDE agrees to in settlement of any claim as well as any and all reasonable expenses or charges as they are incurred by Contractor or any other party indemnified under this Section in cooperating in the defense of any claim.  Contractor will:  (i) give IHDE prompt written notice of the claim; and (ii) allow IHDE to control, and fully cooperate with IHDE (at IHDE's sole expense) in, the defense and all related negotiations.  IHDE will not enter into any stipulated judgment or settlement that purports to bind Contractor without Contractor's express written authorization, which will not be unreasonably withheld or delayed.

9. **Mutual Representations and Warranties**.  Each Party represents and warrants to the other Party that: (a) it is duly organized, validly existing, and in good standing as a corporation or other entity under the laws of the jurisdiction of its incorporation or other organization; (b) it has the full right, power, and authority to enter into and perform its obligations and grant the rights, licenses, consents, and authorizations it grants or is required to grant under this Agreement; (c) the execution of this Agreement by its representative whose signature is set forth at the end of this Agreement has been duly authorized by all necessary corporate or organizational action of such Party; and (d) when executed and delivered by both Parties, this Agreement will constitute the legal, valid, and binding obligation of such Party, enforceable against such Party in accordance with its terms.

10. **Contractor Representations and Warranties**.  Contractor represents and warrants that (a) Contractor will perform the Services using personnel of required skill, experience, and qualifications and in a professional and workmanlike manner in accordance with generally recognized industry standards for similar services; (b) Contractor shall comply with, and shall cause its employees to comply with all security, privacy, health, safety and other operational policies and procedures of IHDE, which are made known to Contractor in writing, at all times while on the premises of IHDE and/or which performing the Services; and (c)  it is not currently under sanction by any state or federally funded health care program and that it will promptly notify IHDE if it becomes aware of any change in status.

EXCEPT FOR THE EXPRESS WARRANTIES SET FORTH IN SECTION 9 AND SECTION 10, ALL SERVICES AND CONTRACTOR MATERIALS ARE PROVIDED "AS IS." CONTRACTOR SPECIFICALLY DISCLAIMS ALL IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE, AND NON-INFRINGEMENT, AND ALL WARRANTIES ARISING FROM COURSE OF DEALING, USAGE, OR TRADE

PRACTICE. WITHOUT LIMITING THE FOREGOING, CONTRACTOR MAKES NO WARRANTY OF ANY KIND THAT THE SERVICES OR CONTRACTOR MATERIALS, OR ANY PRODUCTS OR RESULTS OF THE USE THEREOF, WILL MEET IHDE'S OR ANY OTHER PERSON'S REQUIREMENTS, ACHIEVE ANY INTENDED RESULT, BE COMPATIBLE OR WORK WITH ANY SOFTWARE, SYSTEM, OR OTHER SERVICES, OR BE SECURE, ACCURATE, COMPLETE, FREE OF HARMFUL CODE, OR ERROR FREE. ALL THIRD-PARTY MATERIALS ARE PROVIDED "AS IS" AND ANY REPRESENTATION OR WARRANTY OF OR CONCERNING ANY THIRD-PARTY MATERIALS IS STRICTLY BETWEEN IHDE AND THE THIRD-PARTY OWNER OR DISTRIBUTOR OF THE THIRD-PARTY MATERIALS.

11. **IHDE Representations and Warranties**.  IHDE represents and warrants that (a)  it has or will obtain all necessary licenses and approvals from any government authority within any jurisdiction that requires such qualifications, license, approval or other governmental consent necessary to conduct the activities herein, except where the failure to qualify or obtain licenses or approvals would not have a material adverse effect on its ability to perform its obligations under this Contract; and (b) it is not currently under sanction by any state or federally funded health care program and that it will promptly notify Contractor if it becomes aware of any change in status.

EXCEPT FOR THE WARRANTIES EXPRESSLY SET FORTH IN SECTION 9 AND SECTION 11, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, IHDE DISCLAIMS ANY AND ALL EXPRESS OR IMPLIED REPRESENTATIONS AND WARRANTIES INCLUDING, BUT NOT LIMITED TO, THE IMPLIED WARRANTIES OF FITNESS FOR A PARTICULAR PURPOSE, MERCHANTABILITY, QUIET ENJOYMENT, QUALITY OF INFORMATION, OR TITLE/NON-INFRINGEMENT AND ALL OF THOSE WARRANTIES ARE HEREBY SPECIFICALLY DISCLAIMED.

12. **Limitation of Liability.**    EXCEPT FOR THE PARTIES' INDEMNITY OBLIGATION IN SECTION 7 AND SECTION 8, THE PARTIES GROSS NEGLIGENCE OR WILLFUL MISCONDUCT, VIOLATION OF APPLICABLE LAW (INCLUDING BUT NOT LIMITED TO VIOLATIONS OF HIPAA OR THE PARTIES' BUSINESS ASSOCIATE AGREEMENT), OR BREACH OF SECTION 6 (CONFIDENTIAL INFORMATION), OR LOSSES ARISING OUT OF OR RELATING TO THE PARTIES' UNAUTHORIZED TERMINATION OF THE CONTRACT, NEITHER PARTY WILL BE LIABLE TO THE OTHER PARTY OR TO ANY THIRD PARTY FOR ANY INCIDENTAL, CONSEQUENTIAL, SPECIAL, INDIRECT OR PUNITIVE DAMAGES ARISING OUT OF OR RELATED TO THIS CONTRACT, EVEN IF THE PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF THOSE DAMAGES. NOTWITHSTANDING THE FOREGOING, NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT THE MAXIMUM CUMULATIVE LIABILITY OF CONTRACTOR TO IHDE SHALL BE FIVE MILLION DOLLARS ($5,000,000) FOR ANY REASON OR CAUSE ARISING UNDER THIS AGREEMENT OR ANY ATTACHMENT.    NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT, THE MAXIMUM CUMULATIVE

LIABILITY OF IHDE TO CONTRACTOR SHALL BE FIVE MILLION
DOLLARS ($5,000,000) FOR ANY REASON OR CAUSE ARISING OUT OF
THIS AGREEMENT OR ANY ATTACHMENT. THE FOREGOING
LIMITATION SHALL APPLY TO ANY RELATED OR ANY THIRD PARTY
CLAIMING THROUGH IHDE OR CONTRACTOR, AS APPLICABLE.

13. **Liability Insurance**. Contractor shall obtain an errors and omissions policy or other
suitable insurance coverage with minimum limits of two million dollars ($2,000,000)
per incident and five million dollars ($5,000,000) per annual aggregate, identifying
Contractor and IHDE as additional insureds, insuring Contractor and IHDE against
any and all claims to the extent arising out of Contractor's gross negligence or
wrongful act or omission in accessing, using or disclosing patient Protected Health
Information (PHI) stored by IHDE's Health Information Exchange, including any
such negligence or wrongful act that constitutes a breach or violation of any patient's
privacy rights under any applicable state or federal law or regulation. Contractor
shall obtain such insurance coverage by no later than the Effective Date of this
Agreement. Contractor shall (i) keep in full force and effect the above insurance
coverage during the remainder of the term of this Agreement, (ii) promptly notify
IHDE of any modification or termination of such coverage, and (iii) provide IHDE
with certificates of insurance verifying such coverage upon request, and thereafter
upon the renewal, replacement, or amendment of any of the policies.

14. **Dispute Resolution.** The Parties shall attempt in good faith to resolve any
controversy, claim or dispute (cumulatively "Dispute") arising out of the making or
performance of, or otherwise relating to this Agreement. Any Dispute not resolved
within twenty (20) business days of written notice of the Dispute shall undergo
mediation using a mutually agreed upon mediator having a background in the
industry and subject matter of the Dispute. Mediator costs shall be equally shared.
If the Dispute has not been resolved by the mediation process within twenty (20)
business days after commencement of the process (which occurs with the first
conference or telephone conference mediated by the mediator), any party may
initiate litigation upon five (5) business days' notice to the other Party. The Parties
agree to hold all Disputes in confidence until the first pleading arising from any
litigation has been filed with the court; provided, however, that the Parties shall not
be prohibited by this Section from disclosing and discussing such Disputes with their
respective attorneys, accountants and similar advisors and consultants or other
parties they are required to notify relevant to the Parties' assessment and evaluation
of the issues involved in such Disputes. The procedures herein are exclusive and
shall be fully exhausted prior to the initiation of litigation; provided however, that
nothing herein shall preclude a party from taking any action necessary to preclude
imminent and irreparable harm, including misuse of intellectual property.

15. **Attorney Fees.** In any litigation or proceeding between the Parties to this
Agreement, the prevailing party will be entitled to recover reasonable attorney fees
and expenses, including attorney fees and expenses on appeal or petition for review.
The prevailing party means the party that prevails (wither affirmatively or by means

of a successful defense) with respect to the claims having the greatest value or importance as reasonable determined by the court.

16. **Notices.**  Any required or permitted notice shall be deemed given (a) upon delivery in person or by facsimile transmission, (b) one business day after its transmission by overnight courier, or (c) four business days after transmission by first-class, certified, or registered mail, in each case to the last known business address or facsimile number of the party to whom the notice is directed.

17. **Non-waiver.** No waiver of any default under the Agreement shall constitute a waiver of the provision involved or any subsequent default, and the failure of a party to the Agreement to exercise any right or remedies shall not be deemed to be a waiver of such rights or remedies or grounds for any claim of estoppel.

18. **Severability.**  The provisions of this Agreement are severable, and if any provision of this Agreement is held invalid or unenforceable, it will be enforced to the maximum extent permissible, and the remaining provisions of this Agreement will continue in full force and effect.

19. **Governing Law.**  This Agreement will be governed by Idaho law without regard to conflict of law rules.

20. **Miscellaneous Provisions.**  This Agreement and its attachments (a) constitutes the final and complete agreement of the Parties hereto and supersedes any and all prior or concurrent oral or written representations, statements, or agreements, (b) will be binding upon and inure to the benefit of the Parties hereto and their respective successors and assigns, and (c) may be amended only by a written instrument executed by the Parties hereto.

IN WITNESS WHEREOF, IHDE and Contractor have caused this Agreement to be executed by its duly authorized representatives as of the Effective Date.


**Idaho Health Data Exchange**

By: _____
     Hans Kastensmith
     Executive Director


**Cureous Innovations Inc.**

*Shaun T. Alfreds*
By: Shaun T. Alfreds (Jan 3, 2020)
     _____
     Shaun T. Alfreds
     President & CEO

**ATTACHMENT 1**
**Statement of Work**

**ATTACHMENT 1**

**Statement of Work**

This Statement of Work ("SOW") is an Attachment to the Master Services Agreement ("Agreement") with an Effective Date of December 1, 2019 between Cureous Innovations Inc., with a principal place of business at 60 Pineland Drive, Portland Hall, Suite 230 New Gloucester, ME 04260  (hereinafter, "Contractor") and the Idaho Health Data Exchange ("IHDE"), with a principal place of business at P.O. Box 6978 Boise, ID 83707 for the provision of professional services.  IHDE and Contractor may be referred to in this SOW individually as a "Party" and together as the "Parties."

Whereas, the Agreement permits services performed by Contractor be defined in SOW attachments under the Agreement and;

WHEREAS, Contractor provides services in support of enabling aggregation, exchange, and analytics for PDMPs, clinical, behavioral health, corrections, claims and other social determinates of health data to its customers and;

WHEREAS, IHDE desires to establish the offerings described herein, and Contractor desires to provide IHDE with support to such offerings, subject to the terms and conditions set forth in this SOW.

NOW, THEREFORE, in consideration of the terms and conditions in this SOW and for other good and valuable consideration, the Parties agree as follows:

Contractor will provide services in support of IHDE enabling aggregation, exchange, and analytics for the PDMP, clinical, behavioral health, corrections, claims and other social determinates of health data.

This SOW aligns with IHDE's Idaho Department of Health and Welfare ("IDHW") projects as described in the IHDE-IDHW SOW's 1 & 2.  Most of the services described below support the planning, scoping, and initial implementation of broader work efforts. Future SOWs will include details related to software support, service level agreement and licensing.

1) **Period of Performance.**  The activities covered under this SOW shall begin on December 1, 2019 and will be completed on or about March 31, 2020.

2) **Fees and Payment.**

   a. <u>Fees</u>:  IHDE will pay Contractor a fixed fee in the amount of $331,175 to be paid in four (4) equal installments of $82,793.75, for the Services described in Section 3 (Scope of Services) in accordance with the terms described therein (see Appendix A for a hours and rate breakdown).  IHDE will be responsible for those sales, use, and similar taxes associated with its receipt of the Services excluding taxes based on Contractor's income, real property, or personnel.  The Parties will reasonably cooperate to more accurately determine each Party's tax liability and to minimize the liability to the extent legally permissible.

   b. <u>Travel and Other Expenses</u>: IHDE will reimburse the Contractor for the ordinary and necessary business expenses approved by IHDE and incurred by the Contractor's employee(s) in the performance of their duties including travel (e.g., airfare car rental or other transportation) to and from Idaho lodging, meals, and other incidentals. The Contractor shall document such business expenses in the manner required by IHDE under its

1

policies and procedures, which policies and procedures are intended to comply with the applicable provisions of the Internal Revenue Code of 1986, as amended, and the Treasury Regulations promulgated thereunder.

c. <u>Invoices</u>:  Contractor will invoice IHDE monthly.  Invoices shall be addressed to Hans Kastensmith and emailed or mailed to the Idaho Health Data Exchange, P.O. Box 6978 Boise, 83707.

d. <u>Payments</u>:  IHDE shall pay Contractor within twenty-one (21) days after receipt of Contractor invoice.

3) **Scope of Services.**  Contractor will supply the following services aligned with IHDE Projects:

**Project 1: Aggregating and Disseminating Data**

IHDE is expanding its infrastructure to aggregate data in general and specifically from participants, prescribers, pharmacies to support better care management, care transitions, and data aggregation for persons with substance use disorder ("SUD") and related severe and persistent mental illness diagnosis. This project includes updating participation agreements, consent process, and core Orion Health infrastructure. Contractor's efforts will support the following core activities:

1. **Implementation of Changes to Orion Portal:** Contractor will engage with Orion Health and IHDE to begin the prioritization and implementation of critical changes needed to the Orion Portal.
2. **Development of an Enterprise Specification for Healthcare Interfaces:** Contractor will work with IHDE to review current interface specifications and support the development of new specifications and requirements to meet programmatic needs.
3. **Establish Data Quality Program:** Contractor will work IHDE to begin the data quality mapping processes in order to be able to accurately implement the data quality program. This work will entail engaging Orion Health in the removal of the HLI terminology program and to install and configure Contractor's Term Atlas™ software.
4. **Develop a plan to modify existing HIE participation agreements:** Contractor will engage with IHDE legal and business to review, modify, and update the legal and business requirements of the IHDE participation agreements.
5. **Expand the functionality of core HIE vendor software**: Contractor will engage with Orion Health and IHDE to negotiate a new business relationship with Orion Health including a new long-term contract for Orion Health and partner software programs. Contractor will also support IHDE in implementing high-priority modules (IRIS etc.).
6. **Build a Data Warehouse:** Contractor will support IHDE in the design process that will result in the implementation of a new third-party data warehouse. This will include exploratory activities that may or may involve Contractor software (to be addressed in a separate SOW).

**Project 2: Connect the IHDE to Prescription Drug Monitoring Program (PDMP)**

This project will include the integrated connection between IHDE and the APRISS PDMP vendor as managed by the Idaho Pharmacy Board. Project activities will include deployment of an API manger outside the Orion Health HIE software stack to support Restful and SMART on FHIR API deployment for the integration of PDMP vendor and EHRs.

Contractor will provide software planning, development and implementation resources to support the initial deployment of the APRISS API module within the Orion Health ecosystem. Additional planning resources will support the ongoing planning efforts for data integration.

**Project 3: Enhance IHDE Enterprise Master Person Index (EMPI)**

This project will focus on developing a set of best practices and data standards to ensure appropriate staffing levels to support the ongoing maintenance, communication with downstream systems, and the addition of 3rd party data sets to support the patient identification within IHDE's EMPI for the PDMP and SUD programs. Contractor will support IHDE in developing appropriate SOPs and other processes for managing and maintaining accurate EMPI information in the HIE.

**Projects 4 & 5:  Onboarding of Providers to the HIE, PDMP and IHDE API Infrastructure**

IHDE will commence a project to identify, engage, and onboard up to 50 organizations across the state of Idaho, including hospitals and clinics, to support the integration of HIE with PDMP and SUD programs.

IHDE will establish and administer a fee support fund for organizations that will be participating in the program but not able to afford the fees to connect to IHDE, including changes to the participation agreements across all IHDE Participants to bring forward a sustainable fee schedule that will begin after SUPPORT Act funds are expended.

Contractor will provide legal and contract support to assure that IHDE's onboarding and fee support programs are administered appropriately and accurately.

**Project 6: Website**

Contractor will leverage HealthInfoNet's website architecture to design and implement a new website for IHDE. The website content will be populated by IHDE in support of Contractor and all hosting fees will be the responsibility of IHDE.

IN WITNESS WHEREOF, IHDE and Contractor have caused this Agreement to be executed by its duly authorized representatives as of the Effective Date.

**Idaho Health Data Exchange**

By: *Hans C. Kastensmith*
    Hans C. Kastensmith (Jan 3, 2020)

    Hans Kastensmith
    Executive Director

**Cureous Innovations Inc.**

By: *Shaun T. Alfreds*
    Shaun T. Alfreds (Jan 3, 2020)

    Shaun T. Alfreds
    President & CEO

4

**Appendix A: Hour and Rate Breakdown**

| IHDE CI SOW 1 (12/1/19 - 3/31/20) | | | Hours | | Rates | Total |
|---|---|---|---|---|---|---|
| **TECHNICAL** | | | | | | |
| IS Director | | | 60 | $ | 225.00 | $13,500 |
| Senior Software Developer (Full Stack) | | | 100 | $ | 210.00 | $21,000 |
| Software Developer (Full Stack and Terminology) | | | 176 | $ | 175.00 | $30,800 |
| Senior Rhapsody Analyst | | | 96 | $ | 175.00 | $16,800 |
| HIE Systems Administrator | | | 80 | $ | 150.00 | $12,000 |
| DBA | | | 80 | $ | 150.00 | $12,000 |
| **OPERATIONAL** | | | | | | |
| Senior Subject Matter Expert | | | 60 | $ | 275.00 | $16,500 |
| Corporate Counsel | | | 195 | $ | 250.00 | $48,750 |
| CFO | | | 30 | $ | 225.00 | $6,750 |
| Financial Analyst | | | 21 | $ | 100.00 | $2,100 |
| HIE Operations Director | | | 48 | $ | 225.00 | $10,800 |
| EMPI Quality Analyst | | | 190 | $ | 125.00 | $23,750 |
| Product & Communications Manager | | | 100 | $ | 150.00 | $15,000 |
| **Other** | | | | | | |
| Website Contractor | | | | | | $20,000 |
| Equipment | | | | | | $5,000 |
| Subtotal | | | | | | $254,750 |
| Indirect (30%) | | | | | | $76,425 |
| Total | | | | | | $331,175 |

# CI - IHDE Master Services Agreement Final (1)

**Final Audit Report** 2020-01-03

| | |
|---|---|
| Created: | 2020-01-03 |
| By: | Joyce Alexander (jalexander@idahohde.org) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAA_wzUagm58-zWZu0ouLkS1FkJuJNoqPGk |

## "CI - IHDE Master Services Agreement Final (1)" History

🗋 Document created by Joyce Alexander (jalexander@idahohde.org)
2020-01-03 - 5:16:15 PM GMT- IP address: 63.147.164.98

✉ Document emailed to Hans C. Kastensmith (hck@idahohde.org) for signature
2020-01-03 - 5:18:12 PM GMT

🗋 Email viewed by Hans C. Kastensmith (hck@idahohde.org)
2020-01-03 - 5:25:24 PM GMT- IP address: 12.97.203.239

✍ Document e-signed by Hans C. Kastensmith (hck@idahohde.org)
Signature Date: 2020-01-03 - 5:25:55 PM GMT - Time Source: server- IP address: 12.97.203.239

✉ Document emailed to Shaun T. Alfreds (salfreds@cureousinc.com) for signature
2020-01-03 - 5:25:57 PM GMT

🗋 Email viewed by Shaun T. Alfreds (salfreds@cureousinc.com)
2020-01-03 - 5:26:21 PM GMT- IP address: 97.107.146.142

✍ Document e-signed by Shaun T. Alfreds (salfreds@cureousinc.com)
Signature Date: 2020-01-03 - 5:26:48 PM GMT - Time Source: server- IP address: 97.107.146.142

✓ Signed document emailed to Joyce Alexander (jalexander@idahohde.org), Hans C. Kastensmith (hck@idahohde.org) and Shaun T. Alfreds (salfreds@cureousinc.com)
2020-01-03 - 5:26:48 PM GMT

Adobe Sign

EXHIBIT 2

**ATTACHMENT 2**
**Statement of Work**

This Statement of Work ("SOW") is an attachment to the Master Services Agreement ("**Agreement**") with an Effective Date of April 8, 2020 (the "**Effective Date**"), by and between Cureous Innovations Inc., with a principal place of business at 60 Pineland Drive, Portland Hall, Suite 230 New Gloucester, ME 04260 ("**Licensor**") and Idaho Health Data Exchange with a principal place of business at P.O. Box 6978 Boise, ID 83707  and Idaho Health Data Exchange ("**Licensee**").  Licensor and Licensee may be referred to in this SOW individually as a "Party" and together as the "Parties."

**Recitals**

Whereas, the Agreement permits services performed by Licensor be defined in SOW attachments under the Agreement and;

Whereas, Licensee desires to license certain Licensor software (the "**Software**"), as identified in Exhibit A, and to obtain certain professional services from Licensor (the "**Services**"), as described in Exhibit A, and Licensor desires to license the Software and provide the Services.  For purposes of this SOW, the term "**Deliverable**" means any item, documentation or other material provided by Licensor to Licensee as required by this SOW.  The terms and conditions of this SOW apply to and govern the Software and all Services provided, and Deliverables developed, by Licensor.

In consideration of the foregoing Recitals (which are incorporated into this SOW) and the mutual covenants and agreements provided below, the parties agree as follows:

1.      **Software**.

1.1.      <u>License</u>.  On payment in full of the license fees set forth in Exhibit A, during the license term set forth in Exhibit A (the "**License Term**"), Licensor grants Licensee a non-transferable (subject to Section 14 below), non-exclusive license to use the object/compiled form of the Software for the purpose described in Exhibit A.  The Software is licensed, not sold.  Licensor will furnish Licensee with any updates, bug fixes, or enhancements that Licensor may make generally available to its other similar licensees without charge (all such updates, fixes, and enhancements will be deemed part of and included in the definition of "**Software**").

1.2.      <u>Restrictions</u>.  Licensee may not: (i) use Licensor's intellectual property and Confidential Information to develop a product that is similar to the Software; (ii) use any Licensor Confidential Information to contest the validity of any Licensor intellectual property, including the Software; (iii) remove or destroy any copyright notices, other proprietary markings or confidentiality legends placed on or made available through the Software; (iv) distribute the Software to any third party; (v) use the Software in any manner or for any purpose inconsistent with the terms of this SOW or the Documentation; (vi) create derivative works of or otherwise modify the Software; or (vii) reverse engineer, decompile, or otherwise attempt to derive the trade secrets in the source code to the Software.

2.      **Support**.

2.1      <u>Support Services</u>.  During the License Term, Licensor will provide Support Services in accordance with this SOW and the Service Levels and Support Procedures described in Exhibit A. Support Services shall consist of Licensor using reasonable efforts to correct Errors by way of a modification or addition to the Software's source code that corrects the Error, or a procedure or routine that, when observed in regular operation of the Software, eliminates the practical adverse effect of the Error. Licensee's support staff will be responsible for initially diagnosing any operational or functional problems with the Software, shall report all Errors to Licensor in a timely manner and shall enter details of such Error and any resolution activities and results into Licensor's online knowledge base, where provided. If either party receives repeated reports of inadequate support services being provided by the other, that party may give written notice to the other party requiring a remedial plan to be developed and implemented. Such remedial plan must be successfully implemented within five (5) business days of its mutual acceptance.  If the parties fail to mutually accept such remedial plan, the party submitting the written notice of inadequate support services may terminate this SOW in accordance with clause 4.

2.2    Software Fixes.  In the event that Licensor issues a Software Fix or Update to resolve an Error, Licensee will be responsible for implementing such change to all Licensee environments where required.

2.3    Provision of Support Services.  All Support Services are remotely provided by Licensor and will be provided during the License Term in accordance with Licensee's reasonable security and authentication standards. All connections between the parties shall be secure, encrypted and two factor authenticated.

2.4    Support to be Provided only by Licensor.  In no circumstances shall Licensee request, permit, or authorize a third party, other than Licensor, to provide any Support Services in respect of the Software.

2.5    Updates. During the License Term, Licensor shall make available, at no additional charge, to Licensee any Updates which Licensor makes generally available to its Support Services subscribers subject to the terms and conditions set out in this SOW. Unless otherwise agreed in writing between the parties prior to the time of delivery, Updates are licensed in accordance with the terms and conditions of this SOW.

2.6    Changes to technical environment.  Licensee acknowledges that changes to the configuration of its systems and technical environment may impact the Support Services and/or Service Levels, and agrees to notify Licensor in writing of any such changes. Licensor will use reasonable efforts to notify Licensee of any impact that the change may have on the operation of the Software, provided that any such notification (or failure to provide such notification) shall not be construed as authorization by Licensor of the change.

2.7    Exclusions.  Licensor shall have no obligation to provide Support Services hereunder in connection with Errors or issues: (a) resulting from the misuse or improper use of the Software by Licensee or use other than in accordance with the Documentation or otherwise approved by Licensor in writing, (b) caused by modifications or alterations to the technical environment not approved in writing by Licensor, (c) resulting from Licensee's installation of a new Update in a manner that is not in accordance with the Documentation, (d) resulting from a combination of the Software with software not supplied by Licensor, (e) that could be corrected by the installation of a more current Update, (f) caused by a malfunction of the Licensee's equipment or (g) caused by any act or omission in breach of the terms of this SOW. Licensee shall be responsible for paying Licensor, on a time and materials basis plus all expenses associated with services rendered in connection with any attempt to diagnose or correct an Error that falls within the foregoing Exclusions, including travel, accommodation and other disbursements. To the extent that an Error is caused by Third Party Software or Third Party Content, Licensor will use commercially reasonable efforts to resolve such Error through recourse to the Third Party Licensor, but such Error shall not be subject to the Service Levels. If an Error has been fixed in a current Update, Licensee's exclusive remedy for such Error shall be to install the most current Update to remedy the Error and Licensor shall have no other obligation or liability to Licensee in such instance.

3.    **Fees, Expenses, and Payment**.

3.1    Fees; Taxes.  In consideration of the Services to be performed by Licensor and the license granted herein, Licensee will pay Licensor the fees provided in Exhibit A. Licensor may suspend performance of the Services if Licensee fails to timely pay Licensor as required under this SOW.  Any failure to pay will constitute a material breach of this SOW by Licensee.  Licensee will pay or reimburse Licensor for all sales, use, transfer, privilege, tariffs, excise, and all other taxes and all duties, whether international, national, state, or local, however designated, which are levied or imposed by reason of the license granted herein, performance of the Services and provision of the Deliverables under this SOW; excluding, however, income taxes based on Licensor net revenue.  Unless otherwise provided in this SOW or in one of its Exhibits, or in a Statement of Work executed by the parties, payment for all other services rendered by Licensor shall be at Licensor's then current rates.

3.2    Payment of Invoices.  Unless agreed otherwise in Exhibit A, all invoices not subject to a good faith dispute must be paid by Licensee within thirty (30) days after receipt of Licensor invoice.  Payments not made within such time period will be subject to late charges equal to the lesser of (i) one and one-half percent (1.5%) per month of the overdue amount or (ii) the maximum amount permitted under applicable law.

4.    **Term and Termination**.  This SOW will be effective from the Effective Date through the License Term or until terminated, as provide in Section 2(b) of the Agreement.  The following provisions will

2

survive termination or expiration of this SOW: Sections 3 (Fees, Expenses, Payment), 5 (Intellectual Property Rights), 9 (Limitation of Liability), 12 (Confidentiality), 14 (Dispute Resolution) and 15 (Miscellaneous).

5. **Intellectual Property Rights**. This is not a work made-for-hire agreement (as that term is defined in Section 101 of Title 17 of the United States Code). All right, title, and interest in the Software, Services and Deliverables, including all of Licensor's preexisting intellectual property, including all intellectual property rights and the right to register applicable patents, copyrights, and other rights, will be held and owned exclusively by Licensor. On payment of all fees due under Exhibit A, Licensor grants Licensee a non-exclusive, non-transferable license to use the Deliverables solely for Licensee's internal use and consistent with the purpose described in Exhibit A . Except for the foregoing license, Licensor reserves all rights, title, and interest in and to the Services and Deliverables. Licensee understands and acknowledges that the Deliverables are valuable trade secrets of Licensor and constitute Licensor Confidential Information, as defined below.

6. **Feedback**. Licensee may provide suggestions, comments, or other feedback (collectively, "**Feedback**") to Licensor with respect to its products and services, now existing or developed in the future. Feedback is voluntary and Licensor is not required to hold it in confidence. Licensor may use Feedback for any purpose without obligation of any kind. To the extent a license is required under Licensee's intellectual property rights to make use of the Feedback, Licensee hereby grants Licensor an irrevocable, non-exclusive, perpetual, royalty-free license to use the Feedback in connection with Licensor's business, including enhancement of its products and services. Licensor is not obligated to restrict the future work assignments of its personnel who have had access to Licensee's Feedback.

7. **Limited Warranties**. Licensor warrants that for a period of ninety (90) days from delivery, (i) the Software will operate in substantial conformance with its Documentation and (ii) the Deliverables will operate in substantial conformance with the specifications in Exhibit A if applicable. All warranty claims not made in writing within such period shall be deemed waived. As the sole and exclusive remedy of Licensee for breach of the foregoing warranties, Licensor shall, at its option, either correct the nonconformity or refund to Licensee the fees paid in connection with the relevant Software, Deliverables or Services. The warranties provided in this Section is solely for the benefit of Licensee and Licensee will have no authority to extend such warranty to any third party. The foregoing warranties shall be void to the extent the failure results from a modification of the Software made by Licensee.

8. **Disclaimer of Warranties**. EXCEPT AS PROVIDED IN SECTION 7 (LIMITED WARRANTIES), THE SOFTWARE, SERVICES AND DELIVERABLES ARE PROVIDED "AS IS," WITH ALL FAULTS, AND WITHOUT WARRANTIES OF ANY KIND. EXCEPT AS PROVIDED IN SECTION 7 (LIMITED WARRANTIES), LICENSOR DISCLAIMS ALL OTHER WARRANTIES, EXPRESS AND IMPLIED, INCLUDING, BUT NOT LIMITED TO, THE IMPLIED WARRANTIES OF MERCHANTABILITY, QUALITY OF INFORMATION, QUIET ENJOYMENT, AND FITNESS FOR A PARTICULAR PURPOSE. LICENSEE EXPRESSLY AGREES AND ACKNOWLEDGES THAT USE OF THE SOFTWARE, SERVICES AND DELIVERABLES IS AT LICENSEE'S SOLE RISK. LICENSOR DOES NOT WARRANT THAT THE SOFTWARE, SERVICES AND DELIVERABLES WILL MEET LICENSEE'S REQUIREMENTS, OR THAT THE DELIVERABLES ARE COMPATIBLE WITH ANY PARTICULAR HARDWARE OR SOFTWARE PLATFORM, OR THAT THE OPERATION OF THE SOFTWARE AND DELIVERABLES WILL BE UNINTERRUPTED OR ERROR-FREE, OR THAT DEFECTS IN THE DELIVERABLES WILL BE CORRECTED. FURTHERMORE, LICENSOR DOES NOT WARRANT OR MAKE ANY REPRESENTATION REGARDING THE USE OR THE RESULTS OF THE USE OF THE SOFTWARE OR DELIVERABLES IN TERMS OF THEIR CORRECTNESS, ACCURACY, QUALITY, RELIABILITY, SECURITY, APPROPRIATENESS FOR A PARTICULAR TASK OR APPLICATION, CURRENTNESS, OR OTHERWISE. NO ORAL OR WRITTEN INFORMATION OR ADVICE GIVEN BY LICENSOR OR LICENSOR'S AUTHORIZED REPRESENTATIVES WILL CREATE A WARRANTY OR IN ANY WAY INCREASE THE SCOPE OF THIS WARRANTY.

9. **Limitation of Liability**. EXCEPT WITH RESPECT TO LIABILITY ARISING FROM (A) A PARTY'S INDEMNIFICATION OBLIGATIONS, (B) A BREACH BY A PARTY OF ITS CONFIDENTIALITY OBLIGATIONS, OR (C) A PARTY'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT (COLLECTIVELY, "EXCLUDED LIABILITY"), IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY OR ANY THIRD PARTY FOR ANY INCIDENTAL OR CONSEQUENTIAL DAMAGES (INCLUDING, WITHOUT LIMITATION, INDIRECT, SPECIAL,

3

PUNITIVE, OR EXEMPLARY DAMAGES FOR LOSS OF BUSINESS, LOSS OF PROFITS, BUSINESS INTERRUPTION, LOSS OF DATA, OR LOSS OF BUSINESS INFORMATION) ARISING OUT OF OR CONNECTED IN ANY WAY WITH THE SOFTWARE, SERVICES, DELIVERABLES, OR PERFORMANCE UNDER THIS SOW, OR USE OF OR INABILITY TO USE THE SOFTWARE OR DELIVERABLES, IF ANY, OR FOR ANY CLAIM BY ANY OTHER PARTY, EVEN IF LICENSOR HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.  EXCEPT WITH RESPECT TO EXCLUDED LIABILITY, EACH PARTY'S TOTAL LIABILITY TO THE OTHER PARTY FOR ALL DAMAGES, LOSSES, AND CAUSES OF ACTION (WHETHER IN CONTRACT, TORT, OR OTHERWISE), MAY NOT EXCEED THE AMOUNT OF THE FEES ACTUALLY PAID BY LICENSEE TO LICENSOR DURING THE THREE (3) MONTHS PRIOR TO THE EVENT FIRST GIVING RISE TO LIABILITY.

10.    **Indemnification**.  Licensor shall defend, indemnify, and hold harmless Licensee from and against any claims, damages, or costs, including reasonable attorneys' fees awarded against Licensee, and all reasonable, pre-approved, expenses incurred by Licensee, for any claim of infringement of a third party's U.S. patent, copyright, trade secret, or other intellectual property or property right asserted against Licensee by virtue of Licensee's licensed use of the Software or Deliverables as delivered by Licensor; provided that Licensor is given prompt notice of any such claim and right to control and direct the investigation, preparation, defense and settlement of each such claim and further provided that Licensee shall fully cooperate with Licensor in connection with the foregoing. Notwithstanding the foregoing, Licensor assumes no liability or indemnity obligation for claims of infringement of intellectual property rights arising from (i) use of the Software or Deliverables in combination with third party products, including hardware and software, that are not provided by Licensor, (ii) modifications or maintenance of the Software or Deliverables by a party other than Licensor, (iii) failure of Licensee to use the Software or Deliverables in accordance with the terms of this SOW, (iv) specifications and intellectual property provided by Licensee or its agents; and (v) failure of Licensee to implement any improvement or updates to the Software or Deliverables when made available by Licensor, if the infringement claim would have been avoided by the use of the improvement or updates.  Licensee shall indemnify, defend, and hold harmless Licensor from and against any claims, damages, or costs, including reasonable attorneys' fees, asserted by third parties against Licensor arising out of any of the foregoing exceptions; provided that Licensee is given prompt notice of any such claim and right to control and direct the investigation, preparation, defense and settlement of each such claim and further provided that Licensor shall fully cooperate with Licensee in connection with the foregoing.

11.    **Infringement Remedy**.  If the Software or Deliverables become or, in Licensor's opinion, are likely to become, the subject of a claim of infringement claim for which Licensor is obligated to indemnify Licensee under Section 10, Licensor may, at its option and expense either (a) procure for Licensee the right to continue to use the Software or Deliverables as contemplated under this SOW, or (b) replace or modify the Software or Deliverables and/or modify its use so that they are no longer infringing, without loss of material functionality. If neither option is reasonably available to Licensor, then this SOW may be terminated at the option of either party hereto without further obligation or liability.  In the event termination under this Section occurs during the first two years of the Term, Licensor will refund the fees paid, if any, for the infringing Software or Deliverables, prorated over twelve months from the date of initial delivery to Licensee.

12.    **Confidentiality**.  For this SOW, the Confidential Information provisions in Section 6 of the Agreement apply.

13.    **Force Majeure**.  Either party shall be excused from delays in performing or from failing to perform its obligations under this SOW to the extent the delays or failures result from causes beyond the reasonable control of the party, including, but not limited to, acts of God or of the public enemy, U.S. or foreign governmental actions, pandemic, labor shortages or strikes, communications or utility interruption or failure, fire, flood, epidemic, and freight embargoes.  However, to be excused from delay or failure to perform, the party must act diligently to remedy the cause of the delay or failure.

14.    **Dispute Resolution.**  For this SOW, the Dispute Resolution provisions in Section 14 of the Agreement apply.

15.    **Miscellaneous**.  Neither party shall assign or transfer any rights or obligations under this SOW without the prior written consent of the other party, which consent shall not be unreasonably withheld or delayed. Notwithstanding the foregoing, either party may assign this SOW without consent to an affiliate or to an entity that merges with or acquires all or substantially all of such party's voting stock or assets, upon written notice to

the other party.  This SOW will be governed by and construed in accordance with the laws of the State of Idaho. With respect to any litigation arising out of or relating to this SOW, each party agrees that it will be filed in and heard by the state or federal courts with jurisdiction to hear suits located in Ada County, Idaho.  The parties agree that the United Nations Convention on Contracts for the International Sale of Goods (1980) is specifically excluded from application to this SOW.  The provisions of this SOW shall be deemed severable. If any provision of this SOW shall be held unenforceable by any court of competent jurisdiction, it shall be severed from this SOW and the remaining provisions shall remain in full force and effect.  No course of dealing or usage of trade by or between the parties shall be deemed to affect any such amendment or modification.  Any consent by any party to, or waiver of, a breach by the other, whether express or implied, shall not constitute a consent to, or a waiver of any other, different or subsequent breach. Neither Licensee nor Licensor shall represent that its relationship with respect to the other party is other than as an independent contractor.  Nothing in this SOW shall create in either party any right or authority to incur any obligations on behalf of, or to bind in any respect, the other party and nothing in this SOW shall be construed to create any agency, joint venture or partnership.  This SOW, and all attached Exhibits, as may be amended in accordance with the provisions herein, sets forth the entire SOW between the parties and supersedes prior proposals, SOWs and representations between them related to the subject matter hereof, whether written or oral.  No modifications or amendments to this SOW will be binding upon the parties unless made in writing and executed by duly authorized representatives of Licensor and Licensee. Any written notice or demand required by this SOW shall be sent by registered or certified mail (return receipt requested), personal delivery, overnight commercial carrier, or other guaranteed delivery to the other party at the address set forth herein.  The notice shall be effective as of the date of delivery if the notice is sent by personal delivery, overnight commercial courier or other guaranteed delivery, as of five (5) days after the date of posting if the notice is transmitted by registered or certified mail.  Any party may change the address at which it receives notices by giving written notice to the other party in the manner prescribed by this Section.

16.    **Qualification.** Licensor certifies to the best of its knowledge and belief that it and its principals: 1. Are not presently debarred, suspended, proposed for debarment, declared ineligible, or voluntarily excluded from performing the terms of the contract by a government entity (federal, state or local); 2. Have not, within a three (3) year period preceding the contract, been convicted of or had a civil judgment rendered against them for commission of fraud or a criminal offense in connection with obtaining, attempting to obtain, or performing a public (federal, state, or local) transaction or contract under a public transaction; violation of federal or state antitrust statutes or commission of embezzlement, theft, forgery, bribery, falsification or destruction of records, making false statements, or receiving stolen property; 3. Are not presently indicted for or otherwise criminally or civilly charged by a government entity (federal, state or local) with commission of any of the offenses enumerated in paragraph 2 of this certification; and 4. Have not within a three (3) year period preceding the contract had one or more public transactions (federal, state, or local) terminated for cause or default. Licensor acknowledges that a false statement of this certification may be cause for rejection or termination of the contract and subject Licensor, under 18 U.S.C. §1001, to a fine of up to $10,000.00 or imprisonment for up to five (5) years, or both.

17.    **Definitions.**

In this SOW, capitalized words have the following meaning:

**"Authorized User"** means Licensee's employees, (a) who are authorized by Licensee to access and use the Software under the rights granted to Licensee pursuant to this Agreement; and (b) for whom access to the Software has been purchased hereunder.

**"Documentation"** means the then current version of any documentation furnished by Licensor for the use and operation of the Software.

**"Environment"** an installation of the software in a manner that allows independent use and configuration of the software.

**"Error"** means an error in the Software that causes a failure of the Software to conform substantially to the Documentation.

"**Initial Response Time**" means the elapsed time, during the applicable Support Cover Time, between when Licensor is formally notified of a Support Request by Licensee and the time that Licensor acknowledges receipt of the Support Request and advises Licensee of the next action to be taken.

"**Licensor Service Desk**" means the service provided by Licensor to allow Licensee to report issues so that they are properly recorded and notified to Licensor.

"Major Release" means a new version of the Software that includes changes to the architecture and/or adds new features and functionality in addition to the original functional characteristics of the preceding software release.

"Minor Release" means any new version or release of Software that consists of only minor functionality updates, bug fixes, patches or defect corrections.

"**Services**" means the Support Services, Training Services and the Professional Services to be provided to Licensee by Licensor as specified in this SOW.

"**Service Levels**" means the service level response times specified in Exhibit A of this SOW.

"**Severity Level**" means the severity level for each Support Request received from Licensee, which shall be mutually agreed upon by Licensor and Licensee. In the event that the parties are unable to agree the severity level of an Error, resolution would be achieved using the Support Escalation Procedure specified in Exhibit A.

"**Software**" means the software identified in Exhibit A in machine-readable, object code format, together with all Updates provided by Licensor under this SOW.

"**Software Fix**" means a modification or addition to the Software source code that corrects an Error.

"**Support Escalation Procedure**" means the mechanism specified in Exhibit A to enable Support Service issues to be escalated to Licensee Escalation Personnel and Licensor Escalation Personnel where appropriate.

"**Support Procedures**" means the reporting process specified in Exhibit A.

"**Support Request**" means the logging of a request for Support Services by Licensee Help Desk.

"**Support Services**" means technical support services to be provided by Licensor to Licensee described in Exhibit A.

"**Support Service Cover Times**" means the period during which Licensor will provide the User Support Service to Licensee.

"**Third Party Content**" means third party content that is bundled with, embedded in or required for the operation of the Software.

"**Third Party Software**" means any third party software, including open source software, which is bundled with, embedded in or required for the operation of the Software.

"**Training Services**" means the services provided by Licensor to train the Licensee in the use of the Software as described in Exhibit A.

"**Target Resolution Time**" means the target elapsed time, during the applicable Support Service Cover Time, between when Licensor is notified of a Support Request by Licensee in accordance with this SOW and the time a final position is agreed between Licensor and Licensee, where a solution (which may be remedying the fault or providing a work-around) has been reached or no further action can be taken under the terms of this SOW.

6

This time is a target only, and Licensor does not guarantee that any particular Support Request will be resolved within the specified time period.

"**Update**" means a Major Release and/or a Minor Release made available to Licensee under this SOW.

"**Update Frequency**" means the intervals, unless otherwise agreed by the parties, at which Licensor will provide Licensee with information regarding the resolution of a reported Error during the Support Service Cover Time.

The parties have executed this Attachment 2 by their duly authorized representatives as of the Effective Date.

**Cureous Innovation Inc.**                                    **Idaho Health Data Exchange**

By: _Shaun T. Alfreds (Apr 16, 2020)_              By: _Hans C. Kastensmith (Apr 16, 2020)_

Shaun T. Alfreds                                             Hans Kastensmith
President & CEO                                             President & CEO

# EXHIBIT A

## LICENSED SOFTWARE AND SUPPORT SERVICES

### TermAtlas™ and Smart HL7 Message Archive

1. Licensed Software Description:  TermAtlas™

   TermAtlas™ is a software system designed to cross reference or "map" local clinical codes and/or descriptions specific to a source system into industry accepted values and descriptors in accordance with the ICD, CPT, HCPCS, LOINC and SNOMED medical vocabulary standards.  TermAtlas exposes SOAP and REST APIs to communicate with external systems such as the Rhapsody Integration Engine. TermAtlas also provides an application interface to load local code mappings into the TermAtlas database and to manage mapped and unmapped codes over time.

   Two TermAtlas software licenses are included in this SOW; one for the Licensee's production environment and one for the Licensee's staging environment.

   Licensee is responsible for mapping local codes to industry standards, loading them into TermAtlas and managing local code mappings over time.  Licensee is also responsible for integrating its external system to the published TermAtlas APIs.  At the request of Licensee, Licensor will load newly published ICD, CPT, HCPCS, LOINC and SNOMED medical vocabularies.  Licensee is responsible for securing a license to use each medical vocabulary.

   Licensee Purpose: Internal business operations

   Number of Authorized Users: Up to 5

   License Term:  The Term of this License ("Term") shall commence on the Effective Date and shall continue in full force for one (1) year (the "Initial Term"), unless sooner terminated in accordance with Section 4 of this SOW. The Parties may agree to renew this License for two separate successive periods of  one (1) year each (each such period, a "Renewal Term"; together with the Initial Term, the "Term") upon written notice by Licensee to Licensor on or before September 30, 2020 for the Initial Term, and at least thirty (30) days prior to the end of the then-current Renewal Term.

   Fees: $180,000/year paid annually in advance

2. Licensed Software Description:  Smart HL7 Message Archive

   The Smart HL7 Message Archive is a software system designed to receive, selectively parse and store raw v2 and v3 HL7 messaging in a relational database.  This license includes an application that allows users to easily query and retrieve stored messaging based on pre-defined selection criteria, and to present this information for replay to the Licensee's integration engine.  Two Smart HL7 Message Archive software licenses are included in this SOW; one for the Licensee's production environment and one for the Licensee's staging environment.

   The Licensee will be responsible for providing two separate Rhapsody Integration Engine software licenses; one for the production environment and one for the staging environment.  The Licensor will be responsible for installing these new Rhapsody licenses in the same environment as the Smart HL7 Message Archive database and application servers.  The Licensee will also be responsible for allowing secure connectivity between  the integration engine instances in its existing HIE production and staging environments and  these new Rhapsody instances.
   Licensee Purpose: Internal business operations

Number of Authorized Users: Up to 5

License Term:  The Term of this License ("Term") shall commence on the Effective Date and shall continue in full force for one (1) year (the "Initial Term"), unless sooner terminated in accordance with Section 4 of this SOW. The Parties may agree to renew this License for two separate successive periods of one (1) year each (each such period, a "Renewal Term"; together with the Initial Term, the "Term") upon written notice by Licensee to Licensor on or before September 30, 2020 for the Initial Term, and at least thirty (30) days prior to the end of the then-current Renewal Term.

Fees: $70,000/year paid annually in advance

### 1.  Installation and Implementation

Software installation and implementation is addressed in the CI – IHDE MSA Attachment 4 SOW.

### 2.  Support Service Cover Times

Licensor will provide the Support Service to the Licensee as follows:

<u>Support Procedures</u>

In the event that the Licensee requires support from Licensor, the Licensee will notify the Licensor Service Desk of an identified Error and such notification is:

- by telephone or online if the matter is considered a Severity Level 1 Error; and

- by email or online electronic registration, where available, if the matter is a severity level 2, 3, 4 or 5 Error.

Licensee must provide Licensor, at the time of each Support Request, with the information that Licensor reasonably requires in order to reproduce the operating conditions similar to those present when the Error was discovered. The list of required information is documented in the Licensor Support Engagement Process document and includes, for example:

- Defined minimum dataset including details of the system affected by the Error.

- Replication steps and/or a documented example of the Error where reasonably practicable.

Licensor will manage Support Requests by:

- logging, where access to the call logging system is unavailable, and routing of Support Requests.

- providing the Licensee with a unique reference number for each Support Request.

- monitoring the Severity Level status.

- progressing the issue from initiation to resolution.

<u>Service Levels</u>

Licensor will provide Support Services in respect of the Software in accordance with the following Service Levels:

| Severity Level | Initial Response Time | Target Resolution Time | Update Frequency |
|---|---|---|---|

| 1 | 1 hour | 1 Business Day | 4 hours |
|---|--------|----------------|--------|
| 2 | 4 hours | 2 Business Days | Daily |
| 3 | 1 Business Day | As part of the next Minor Release | N/A |
| 4 | 2 Business Days | Future Update | N/A |
| 5 | 2 Business Days | By Agreement | N/A |

| Severity Level | Definition |
|----------------|------------|
| 1 | Total production environment Software failure. |
| 2 | Substantial portion of the production environment Software inoperable, significantly affecting workflow in critical areas. |
| 3 | Part of the Software fails but impact is minor or workaround available. |
| 4 | A minor Error with minimal business impact. |
| 5 | Requests for advice, enquiry, change request or enhancement to the Software. |

Support Escalation Procedure

In the event of an issue arising during the provision of the Support Services, both parties will use reasonable endeavors to resolve the problem at that level.

At any point, at the discretion of the Licensee or Licensor personnel, the issue may be escalated to the attention of more senior personnel in either organization, in accordance with the following order if:

- either party feels it is failing to receive a satisfactory response.

- either party feels the issue requires more senior attention, because of the nature of the issue.

| Escalation Level | Licensee Escalation Personnel | Licensor Escalation Personnel |
|------------------|-------------------------------|-------------------------------|
| Level One | XXXXX | Support Team Lead |
| Level Two | XXXXX | Program Director |
| Level Three | XXXXX | Executive Sponsor |

Development Services

Licensee may request additional development services from Licensor, which shall be charged at the rate of $225/hour by Licensor.  The Parties shall enter into a written SOW document that reasonably defines at a minimum the scope of work and estimated costs.

10

EXHIBIT 3

**ATTACHMENT 3**
**Statement of Work**

This Statement of Work ("SOW") is an Attachment to the Master Services Agreement ("Agreement") with an Effective Date of April 8, 2020 ("Effective Date") by and between Cureous Innovations Inc., with a principal place of business at 60 Pineland Drive, Portland Hall, Suite 230 New Gloucester, ME 04260  (hereinafter, "Contractor") and Idaho Health Data Exchange ("IHDE"), with a principal place of business at P.O. Box 6978 Boise, ID 83707 for the provision of professional services.  IHDE and Contractor may be referred to in this SOW individually as a "Party" and together as the "Parties."

**Recitals**

Whereas, the Agreement permits services performed by Contractor be defined in SOW attachments under the Agreement and;

WHEREAS, Contractor provides infrastructure as a service ("IaaS Service" or "Services") for its TermAtlas™ and Smart HL7 Message Archive software and;

WHEREAS, IHDE desires to receive access to the TermAtlas and Smart HL7 Message Archive software and Contractor desires to provide IHDE with such Services subject to the terms and conditions set forth in this SOW.

NOW, THEREFORE, in consideration of the foregoing recitals (which are incorporated into this SOW) and the mutual covenants and agreements provided below, the Parties agree as follows:

A. Definitions

    1. **Authorized Users:** means IHDE's employees who are authorized by IHDE to access and use the Services under the rights granted to IHDE pursuant to this SOW; and (b) for whom access to the Services has been purchased hereunder.

    2. **Burn-in Period:** 30 days following the Environment Turnover Date.

    3. **Contractor Intellectual Property Rights**: means the Services, the Documentation, and all intellectual property provided to IHDE or any other Authorized User in connection with the foregoing. For the avoidance of doubt, Contractor IP includes Resultant Data and any information, data, or other content derived from Contractor's monitoring of IHDE's access to or use of the Services, but does not include IHDE Data.

    4. **Contractor Materials**: means the Services, Specifications, Documentation  and Contractor Systems and any and all other information, data, documents, materials, works, and other content, devices, methods, processes, hardware, software, and other technologies and inventions, technical or functional descriptions, requirements, plans, or reports, that are provided or used by Contractor or any Subcontractor in connection with this SOW or otherwise comprise or relate to the provision of Services to IHDE under the SOW or Contractor Systems.  For the avoidance of doubt, Contractor Materials include Resultant Data and any information, data or other content derived from Contractor's monitoring of IHDE's access to or use of the Services, but does not include IHDE data.

    5. **Contractor Systems**: means the information technology infrastructure used by or on behalf of Contractor in performing the Services, including all computers, software, hardware, databases, electronic systems (including database management systems), and networks, whether operated directly by Contractor or through the use of third-party services.

    6. **Data Center**: Physical or cloud installation of systems  for the purpose of hosting the Services.

    7. **Documentation**:  means any manuals, instructions, or other documents or materials that the Contractor provides or makes available to IHDE in any form or medium and which describe the functionality, components, features, or requirements of the Services or Contractor Materials, including any aspect of the installation, configuration, integration, operation, use, support, or maintenance thereof.

8. **Downtime**: Any time, other than Downtime Exclusions, where the Services are not substantially available to IHDE. Downtime includes but is not limited to any time in which a Critical severity IT Incident is open and unresolved. For the purposes of Downtime calculation, an IT Incident is considered resolved when a final position is agreed between Contractor and IHDE, where either a solution (which may be remedying the Fault or providing a work-around) has been reached or no further action can be taken under the terms of this SOW. The Downtime does not include any time spent waiting for a response from IHDE regarding the corresponding IT Incident.

9. **Downtime Exclusions**: Downtime does not include unavailability caused by: (1) Scheduled Maintenance (2) flaws in IHDE's data; (3) acts or omissions of IHDE or its agents, including all testing of the Services by IHDE or a third party vendor; (4) the failure of servers or services outside of a Data Center on which the Services are dependent and which are not operated by Contractor; (5) inaccessibility of the Internet that is not due to Contractor's network or network providers; (6) failure of VPN connectivity caused wholly or in part by systems not managed by Contractor as part of Services; (7) a Force Majeure event; (8) unavailability of non-production Environments.

10. **Environment**: an installation of the software in a manner that allows independent use and configuration of the software.

11. **Environment Turnover Date**: The date Contractor notifies IHDE, in writing, that an Environment is ready for IHDE's use following initial implementation by Contractor.

12. **Force Majeure Event**: includes acts of God, pandemic, flood, fire, earthquake or explosion, war, terrorism, invasion, riot or other civil unrest, embargoes or blockades in effect on or after the date of this Agreement, national or regional emergency, strikes, labor stoppages or slowdowns or other industrial disturbances, passage of Law or any action taken by a governmental or public authority, including imposing an embargo, export or import restriction, quota, or other restriction or prohibition or any complete or partial government shutdown, or national or regional shortage of adequate power or telecommunications or transportation.

13. **IaaS Services**: includes the compute, storage, networking, connectivity and security services provided by Contractor to host TermAtlas™ and Smart HL7 Message Archive software.

14. **IDS (Intrusion Detection System)**: a device or software application that monitors a network and computing resources for malicious activities such as security threats or policy violations and reports them.

15. **IHDE Data**: means information, data and other content in any form or medium, that is submitted, posted or otherwise transmitted by or on behalf of IHDE or any Authorized User through the Service.

16. **Instance**: an installation of one or more software Environments within a particular network topology, whether physical or virtual.

17. **IPS (Intrusion Prevention System)**: A device or software application that monitors a network and computing resources for malicious activities such as security threats or policy violations. The system identifies suspicious activity, and logs information, attempts to block the activity, and reports it.

18. **IT Incident**: An unplanned interruption to the Services, a reduction in the quality of a Service, or an event that has not yet impacted the Services, but which has the potential to cause impact.

19. **MRC (Monthly Recurring Charge)**: The total dollar amount of payments due from IHDE to Contractor on a repeated monthly basis.

20. **NIST CSF**: the National Institute of Technology's Cybersecurity Framework Version 1.1 as detailed in the document, "Framework for Improving Critical Infrastructure Security Version 1.1", dated April 16, 2018 and available at: https://nvlpubs.nist.gov/nistpubs/CSWP/NIST.CSWP.04162018.pdf

21. **Peak Smart HL7 Message Archive Volume:** Receive, process and store 500,000 HL7v2 and 10,000 HL7v3 messages per day into the database archive in the internal production instance, and 250,000 HLv2 and 5,000 HL7v3 messages per day in the internal staging instance.

22. **Peak TermAtlas™ Volume:** Ten (10) ) million term translation requests and results returned per day in the internal production instance, and Five (5)  million term translation requests and results returned per day in the internal staging instance.

23. **Penetration Testing**: Engagement of a third-party security specialist to attempt to gain unauthorized access to the LAN, or virtual cloud infrastructure of Contractor, through exploitation of technical vulnerabilities and/or social engineering techniques.

24. **PHI (Protected Health Information)**: Protected Health Information as defined by the Health Insurance Portability and Accountability Act of 1996 and its implementing regulations.

25. **Resolution Time Objective**: the target elapsed time between when Contractor receives notification of a request for Services by IHDE or otherwise becomes aware of an IT Incident or Security Incident, and the time a final position is agreed between Contractor and IHDE, where either a solution (which may be remedying the incident or providing a work-around) has been reached or no further action can be taken under the terms of this SOW.  The Resolution Time Objective does not include any time spent waiting for a response from IHDE.

26. **Receipt Acknowledgement Time Objective**: The elapsed time between when Contractor receives notification of a request for Services by IHDE and the time that Contractor acknowledges receipt of that request.

27. **Resultant Data**: means usage data and information related to IHDE's access to or use of the Services that is used by Contractor in an aggregate and anonymized manner such that no individual or IHDE is identified or identifiable as a source of such data, including to compile statistical and performance information related to the provision and operation of the Services.  Resultant Data shall not include IHDE Data. IHDE hereby grants Contractor a limited, non-exclusive, non-sublicensable, non-transferable license to use Resultant Data solely for Contractor's internal business purposes.  Contractor shall only use Resultant Data for this permitted use and shall not disclose, release, distribute, or deliver Resultant Data to any third party without IHDE's prior written consent.

28. **Scheduled Maintenance**: Periodic scheduled upgrades and maintenance which will require making the Services unavailable for limited times, scheduled by Contractor and agreed to at least 48 hours in advance by IHDE, provided that Scheduled Maintenance times may not exceed 12 hours per month. Examples of downtime for scheduled maintenance may include upgrades to hardware, network device operating systems or configurations, application server operating systems, upgrades or configuration changes to applications, upgrades or configuration changes to database software and upgrades or configuration changes to virtual software management systems.

29. **Security Incident**: An event that may indicate that the systems or data related to the Services have been compromised or that measures put in place to protect them have failed. Includes but is not limited to any attempted or successful unauthorized access, use, disclosure, modification, or destruction of information or interference with system operations in an information system used in provision of the Services.

30. **Service Internet and Data Egress Capacity**: Up to 50 Mbps (Megabits Per Second) each for both upload and download capacity, and up to 1TB data egress per month.

31. **Service Metrics**: Includes any or all of the following defined Objectives: Receipt Acknowledgement Time Objective, Resolution Time Objective, Incident Notification Objective, System Availability Objective, Implementation Duration Objective, or Data Backup Objective.

32. **Services**: means the IaaS Services to be provided by Contractor to IHDE as specified in this SOW.

33. **SIEM System (Security Information and Event Management System)**: Technology capability that monitors computing environment 24 x 7, to gather security event data to detect, analyze, and correlate events. This may be provided through a system operated by internal staff or through a managed service. The system will identify security events that are a cause for concern, including any events that require urgent response.

34. **Third-Party Materials**: means materials and information, in any form or medium, including any open-source or other software, documents, data, content, specifications, products, equipment, or components of or relating to the Services that are not proprietary to Contractor.

35. **Ticket**: A record of a request for service by IHDE or a record of an IT Incident or Security Incident discovered by Contractor. Requests from IHDE may or may not be related to an Incident. The ticket will contain the time and date the service was requested or the Incident was discovered, a description of the issue, Contractor follow up contact, and the current status of follow up.

36. **IHDE Computing Environment**: The computing installation(s) established by IHDE. that will connect to Services provided by the Contractor.

37. **Vulnerability Scanning**: The use of specialized automated toolsets to survey network and computing resources for security weaknesses. The survey results in detailed reports of any deficiencies identified.

B. Access and Use

1.1. **Provision of Access**: Subject to and conditioned on IHDE's and its Authorized Users' compliance with the terms and conditions of this SOW, and as applicable, the Agreement, Contractor hereby grants IHDE a revocable, non-exclusive, non-transferable (except to a successor of IHDE in connection with a merger, acquisition, or sale of all or substantially all of IHDE's assets), non-sublicensable limited right to access and use the Services during the Term, solely for IHDE's internal business operations by Authorized Users in accordance with the terms and conditions herein. Contractor shall provide IHDE with the necessary passwords and access credentials to allow access to the Services. IHDE shall be responsible for keeping the passwords and access credentials associated with the Services confidential and shall not sell or transfer them to any other person or entity. IHDE shall promptly notify Contractor of any unauthorized access to its passwords or access credentials.

1.2. **Documentation License**: Subject to the terms and conditions contained in this SOW, and as applicable the Agreement, Contractor hereby grants IHDE a non-exclusive, non-sublicensable, non-transferable (except to a successor of IHDE in connection with a merger, acquisition, or sale of all or substantially all of IHDE's assets) license for Authorized Users to use the Documentation during the Term solely for IHDE's internal business purposes in connection with its use of the Services.

1.3. **Service and System Control**: Except as otherwise expressly provided in this SOW, as between the Parties: (a) Contractor has and will retain sole control over the operation, provision, maintenance, and management of the Contractor Materials; and (b) IHDE has and will retain sole control over the operation, maintenance, and management of, and all access to and use of, the IHDE Systems, and sole responsibility for all access to and use of the Contractor Materials by its Authorized Users by or through the IHDE Systems or any other means controlled by IHDE or any Authorized User, including any: (i) information, instructions, or materials provided by any of them to the Services or Contractor; (ii) results obtained from any use of the Services or Contractor Materials; and (iii) conclusions, decisions, or actions based on such use. IHDE is responsible and liable for all uses of the Services and Documentation resulting from access provided by IHDE, directly or indirectly, whether such access or use is permitted by or in violation of this SOW. Without limiting the generality of the foregoing, IHDE is responsible for all acts and omissions of Authorized Users, and any act or omission by an Authorized User that would constitute a breach of this SOW if taken by IHDE will be deemed a breach of this SOW by IHDE. IHDE shall use reasonable efforts to make all Authorized Users aware of this SOW's provisions as applicable to such Authorized User's use of the Services and shall cause Authorized Users to comply with such provisions.

1.4. **Downloadable Software**: Use of the Services may require or include use of downloadable software. Contractor grants IHDE a non-transferable, non-exclusive, non-assignable (except to a successor of IHDE in connection with a merger, acquisition, or sale of all or substantially all of IHDE's assets), limited right for Authorized Users to use downloadable software provided as part of the Services.

1.5. **Reservation of Rights**: Except as expressly set forth herein, nothing in this SOW grants IHDE any right, title, or interest in or to (including any license under) any Contractor Intellectual Property Rights in or relating to, the Services, Documentation, Contractor Materials, Contractor Systems or Third-Party Materials, whether expressly, by implication, estoppel, or otherwise. All right, title, and interest in and to the Services,

4

Documentation, Contractor Materials, Contractor Systems and Third-Party Materials are and will remain with Contractor and the respective rights holders in the Third-Party Materials.

1.6. **Use Restrictions**: IHDE shall not, and shall not permit any Authorized Users to use the Services, any software component of the Services, or Documentation for any purposes beyond the scope of the access granted in this SOW. IHDE shall not, at any time, directly or indirectly, and shall not permit any Authorized Users to: (i) copy, modify, or create derivative works of the Services, any software component of the Services, or Documentation, in whole or in part; (ii) rent, lease, lend, sell, license, sublicense, assign, distribute, publish, transfer, or otherwise make available the Services or Documentation; (iii) reverse engineer, disassemble, decompile, decode, adapt, or otherwise attempt to derive or gain access to any software component of the Services, in whole or in part; (iv) remove any proprietary notices from the Services or Documentation; or (v) use the Services or Documentation in any manner or for any purpose that infringes, misappropriates, or otherwise violates any intellectual property right or other right of any person, or that violates any applicable law rule or regulation.

1.7. **Compute Capacity**:  Contractor will provide sufficient  compute capacity throughout the Term within each Instance to support Peak TermAtlas™ Volume and Peak Smart HL7 Message Archive Volume.

1.8. **Storage Capacity**:  Contractor will provide a total of 5TB in the production environment and a total of 5.0 TB in the staging environment.

1.9. **Instances**:  Contractor will host Services on behalf of IHDE for one instance each of TermAtlas and Smart HL7 Message Archive software in Azure.

1.10. **Environments**: Contractor will provide two Environments for access to and use by IHDE, including one for production use and one for staging use.


2. Network Services


2.1. **Internet Bandwidth**: Contractor will provide Service Internet and Data Egress Capacity in the Service Fees described in Exhibit A.

2.2. **Connectivity to IHDE**: Contractor will provide firewall configuration, Virtual Private Network (VPN) setup, Domain Name Service (DNS) configuration, and/or network support not to exceed 20 hours of network engineer time to establish connectivity between the IHDE Computing Environment and the TermAtlas and Smart HL7 Message Archive Environments included in the MRC in Exhibit A.

2.3. **Basic Network Support**: Contractor will provide basic network support to maintain network service including patching and updating of network infrastructure as required included in the MRC.  For the avoidance of doubt, this includes maintaining existing established network connectivity and excludes setup of new network configurations or changes to existing configurations requested by IHDE.

2.4. **Additional Network Services**: Contractor will provide firewall configuration and setup, VPN configuration, DNS configuration, and other network services not included in Connectivity to IHDE as required for the additional fees listed in Exhibit A.


3. Security


3.1. **Physical Security Procedures**: Contractor shall maintain and enforce physical security procedures with respect to its access, use, and possession of IHDE Data, at least equal to industry standards for such types of locations, and provide commercially reasonable and appropriate technical and organizational safeguards against accidental or unlawful destruction, loss, alteration, or unauthorized disclosure or access of such IHDE Data. Without limiting the generality of the foregoing, Contractor will take commercially reasonable measures to secure and defend its location and equipment against "hackers" and others who may seek, without authorization, to modify or access systems or the information found therein.

3.2. **NIST CSF Assessment**: Contractor will engage a third-party security specialist on an annual basis to conduct an assessment of Contractor's security environment and program. The assessment will be conducted using the NIST CSF as the conformance standard. Contractor will provide a written synopsis of the NIST CSF assessment results to IHDE within 45 days of completion of the assessment. Contractor and IHDE agree to work in good faith to address any non-conformant areas

3.3. **Penetration Testing**: Contractor will conduct an external penetration test on an annual basis, and to provide a written synopsis of the results with IHDE within 45 days of completion of the testing. Contractor and IHDE agree to work in good faith to address any deficiencies in a timely manner.

3.4. **Vulnerability Scanning**: Contractor will conduct monthly external vulnerability scanning, and annual internal vulnerability scanning of IHDE Hosting Resources, and provide a written synopsis of the results with IHDE within 45 days of testing completion. Contractor and IHDE agree to work in good faith to address any deficiencies in a timely manner.

3.5. **IDS/IPS**: Contractor will maintain an IDS and IPS system during the Term. Contractor will ensure 24 x 7 response for Security Incidents identified by the IDS/IPS requiring urgent response, to remediate or mitigate events as rapidly as possible.

3.6 **SIEM**: Contractor will maintain a SIEM system during the Term. Contractor will ensure 24 x 7 response for Security Incidents identified by the SIEM system requiring urgent response, to remediate or mitigate events as rapidly as possible.

4. General Infrastructure Services:

4.1. **Updates and Patches**: Contractor will maintain technical environments and software in a timely fashion to ensure the environments and software remains current and supportable by applicable vendors. Contractor will apply critical security patches and/or to mitigate zero-day threats on an expedited basis. Contractor and IHDE agree to work together in good faith to agree on patching and updating requirements and plans.

4.2. **Backups**: Contractor will create backups of all data and configurations of IHDE in its hosted systems no less than once every 24 hours.

4.2.1. **Data Backup Objective**: Backup jobs will be completed as specified in 4.2. A back-up job that initially is unsuccessful but is subsequently corrected within one Business Day shall be considered a successful backup for these purposes. Measurement of this objective will occur daily.

5. Incidents, Classification, and Response:

5.1. Each occurrence of an IT Incident or Security Incident will be classified according to the schema defined herein. Contractor and IHDE shall work together in good faith to classify IT and Security Incidents. However, in the event of a conflict, IHDE's classification of the incident shall take precedence.

5.2. IT Incidents shall be classified according to the following severity schema:

| Severity | Definition |
|---|---|
| Critical | An IT Incident that causes complete loss of some or all of the Services to IHDE's production Environment such that work cannot reasonably continue and no workarounds to provide all of the functionality of the Service required under the SOW are possible or cannot be implemented in time to minimize the impact on IHDE's business. |
| High | An IT Incident that results in a significant loss of some or all of the Services to IHDE's production Environment such that processing can proceed in a restricted fashion but performance is significantly reduced and / or operation of the Service is considered severely limited and no workaround to provide the affected functionality is possible or cannot be implemented in time to minimize the impact on IHDE's business. |
| Moderate | An IT Incident that results in minimal loss of some or all of the Services to IHDE's production Environment such that the impact of the incident is minor or an inconvenience, such as requiring a manual bypass to restore functionality, or which results in any loss of some or all of the Services to IHDE's test or development Environments. |
| Minor | An IT Incident that causes no loss of service and in no way impedes IHDE's use of the Service in accordance with the Statement of Work. |

5.3. Notwithstanding the foregoing, IT Incidents will not be classified as Critical or High severity during the Burn-in Period.

5.4. Security Incidents shall be classified according to the following severity schema:

| Severity | Definition | Examples |
|---|---|---|
| Critical | A Critical-level Security Incident is an event that can cause significant damage, corruption, or loss (compromise) of confidential, critical and/or strategic organizational information or PHI. The event can result in potential damage and liability to IHDE and to its public image and may degrade client and community confidence concerning its services. Risks of Critical incidents include exposure to criminal penalties; exposure to major financial losses; potential threat to life, health or public safety; major damage to reputation or operations. | • Known or potential theft or loss of confidential IHDE or Protected Health Information<br>• Disruption of or denial of service attacks on systems<br>• Unauthorized access to systems<br>• Failure of a critical security system<br>• All unauthorized computer intrusions, malware infections, any attacks against the IT infrastructure. |
| High | A High-level Security Incident is an event that may cause damage, corruption, or loss of replaceable information without compromise, may have a moderate impact on the organization's operations or reputation, or may result in legal liability to the organization. Risks of High-level incidents include exposure to minor financial losses or minor damage to reputation or operations. | • A "hacked" system is used in attacks on other non-IHDE systems and organizations<br>• A worm causes fraudulent mass emailing from infected systems<br>• Misuse or abuse of authorized access<br>• Unusual system performance or behavior<br>• Unexplained access privilege changes<br>• Unusual after-hour activities, etc. |
| Moderate | A Moderate-level Security Incident is an event that causes inconvenience, aggravation, and/or minor costs associated with recovery, unintentional actions at the user or administrator level, or unintentional damage or minor loss of recoverable information.<br>The event will have little, if any, material impact on IHDE's operations or reputation. Risks of Moderate-level events include exposure to minimal financial losses, or minimal or no damage to reputation or operations. | • Sharing of passwords that does not result in unauthorized access<br>• Policy or procedural violations. |
| Minor | A Minor-level Security Incident includes suspicious activities include such as observations that indicate possibility of past, current, or threatened security incident, but that may be consistent with authorized or non-harmful activities. | • Access logs show limited number of unsuccessful attempts by an authorized user.<br>• System activity occurring at an unusual time of day. |

8

5.5. Incident Response Objectives: Incident Response Objectives are as follows:

| Severity | Receipt Acknowledgement Time Objective | Resolution Commences Within | Resolution Time Objective | Coverage Hours |
|---|---|---|---|---|
| Critical | 1 hour | 1 hour | 4 hours | 24/7 |
| High | 2 hours | 2 hours | 8 hours | 24/7 |
| Moderate | Next Working Day | 1 day | 2 weeks | 8am– 5pm Mountain |
| Minor | 2 Working Days | 1 week | By agreement between IHDE and Contractor | 8am– 5pm Mountain |

Notification of Contractor regarding an incident shall be deemed to have occurred when IHDE notifies Contractor of the incident via the Contractor's incident notification procedures, or when Contractor detects an incident via its monitoring systems and procedures.

5.6. Incident Notification Objectives (from Contractor to IHDE):

5.6.1. IHDE will provide a written procedure to Contractor to notify IHDE leadership of an incident.

5.6.2. If Contractor attempts to notify IHDE leadership according to the notification procedure provided, but IHDE fails to respond to or acknowledge the notification, notification by Contractor shall be deemed to have occurred. However, Contractor is required to make good faith efforts to continue to attempt to reach IHDE leadership.

5.6.3. Contractor shall notify IHDE leadership of Critical or High IT or Security Incidents within one hour of acknowledgement by Contractor.

5.6.4. Contractor shall notify IHDE leadership of Moderate or Minor IT or Security Incidents within the next business day following acknowledgement by Contractor.

6. Service Availability Objective:

6.1. Each of the following Service Availability Objectives shall be measured separately. Service Credits, if they apply, shall be cumulative.

6.2. The following are the Service Availability Objectives for the applicable service:

a.   Downtime of the production TermAtlas™ Service shall be no more than .5% per month.

b.   Downtime of the production Smart HL7 Message Archive shall be no more than .5% per month.

7. Help Desk and Ticketing Services:

7.1 Annually, Contractor will provide IHDE with a written procedure for requesting services and assistance ("Help Desk and Ticketing Services"). The Help Desk and Ticketing Services will be available 24 x 7. For clarity, this requirement implies that there is a method for requesting services that enables Contractor to receive a request sufficient for Contractor to commit to meeting Receipt Acknowledgement Time Objectives for IT Incidents and/or Security Incidents where response is requested by IHDE.

7.2. Contractor may provide different methods for IHDE to use for requesting services based on IHDE's perceived severity of the incident, and/or time of day, at Contractor's discretion.

7.3. Request from IHDE to Contractor will be considered to have been made when IHDE completes the first request according to the instructions provided to IHDE by Contractor.

7.4. Contractor shall timely establish and update a Ticket for each request from IHDE, and each IT or Security Incident identified by Contractor.

7.5. Ticket records shall be accessible to IHDE for review 24 x 7.

C. Service Level Provisions

1. Failure by Contractor to meet Service Metrics shall result in Service Credits from Contractor to IHDE, described in Exhibit A. Service Credits will not be assessed during the Burn-in Period.

2. A material failure to otherwise provide the Services as described herein shall be a Service Breach.

2.1. IHDE must notify Contractor in writing of any Service Breach.

2.2. Contractor shall have 30 days after notification to cure any Service Breach, or such time as agreed by IHDE. Contractor and IHDE agree to negotiate in good faith to allow Contractor to use commercially reasonable efforts to cure any Service Breach, with priority given to resolution of materially harmful impacts on IHDE's business.

3. A failure to meet Service Metrics shall also be considered a Service Breach if the same Service Metric Objective is not met for a period of four (4) consecutive months.

4. IHDE may terminate this SOW upon written notice to the Contractor in the event of a Contractor Service Breach and such breach is not cured within thirty (30) days after receipt of IHDE's notice, or within such period as agreed between the Parties.

D. Implementation:

1. Implementation Duration Objective: All Instances and Environments will be available for their intended use by IHDE no later than September 30, 2020. This includes production use of the production environments.

2. Delays caused by waiting for responses from IHDE will not count against the implementation duration.

E. Term:

1.1. The Term of this SOW ("Term") shall commence on the Effective Date and shall continue in full force for one (1) year (the "Initial Term"), unless sooner terminated in accordance with Section 2 of the Agreement. The Parties may agree to renew this SOW for two separate successive periods of one (1) year each (each such period, a "Renewal Term"; together with the Initial Term, the "Term") upon written notice by IHDE to Contractor on or before September 30, 2020 for the Initial Term, and at least thirty (30) days prior to the end of the then-current Renewal Term.

2. Price Increases:

2.1. Commencing with the first day of each Renewal Term Contractor's fees described in Exhibit A may increase up to four (4) percent annually.

**Other Provisions**

1. For this SOW the Termination, Expenses, Invoicing, Payments, Contractor Status, Ownership of Work Product, Confidential Information, Indemnification, Mutual, Contractor and IHDE Representations and Warranties, Limitation of Liability, Liability Insurance, Dispute Resolution, Attorney Fees, Notices and Governing Law Provisions of the Agreement apply.

2. Force Majeure.  Except with regard to payment obligations for work performed by Contractor, either Party shall be excused from delays in performing or from failing to perform its obligations under this SOW to the extent the delays or failures result from a Force Majeure event. However, to be excused from delay or failure to perform, the Party must act diligently to remedy the cause of the delay or failure.

3. Feedback.  IHDE may provide suggestions, comments, or other feedback (collectively, "Feedback") to Contractor with respect to its Services, now existing or developed in the future.  Feedback is voluntary and Contractor is not required to hold it in confidence. Contractor may use Feedback for any purpose without obligation of any kind.  To the extent a license is required under IHDE's intellectual property rights to make use of the Feedback, IHDE hereby grants Contractor an irrevocable, non-exclusive, perpetual, royalty-free license to use the Feedback in connection with Contractor's business, including enhancement of its Services.  Contractor is not obligated to restrict the future work assignments of its personnel who have had access to IHDE's Feedback.

4. Qualification. Contractor certifies to the best of its knowledge and belief that it and its principals: 1. Are not presently debarred, suspended, proposed for debarment, declared ineligible, or voluntarily excluded from performing the terms of the contract by a government entity (federal, state or local); 2. Have not, within a three (3) year period preceding the contract, been convicted of or had a civil judgment rendered against them for commission of fraud or a criminal offense in connection with obtaining, attempting to obtain, or performing a public (federal, state, or local) transaction or contract under a public transaction; violation of federal or state antitrust statutes or commission of embezzlement, theft, forgery, bribery, falsification or destruction of records, making false statements, or receiving stolen property; 3. Are not presently indicted for or otherwise criminally or civilly charged by a government entity (federal, state or local) with commission of any of the offenses enumerated in paragraph 2 of this certification; and 4. Have not within a three (3) year period preceding the contract had one or more public transactions (federal, state, or local) terminated for cause or default. Contractor acknowledges that a false statement of this certification may be cause for rejection or termination of the contract and subject Contractor, under 18 U.S.C. §1001, to a fine of up to $10,000.00 or imprisonment for up to five (5) years, or both.

The parties have executed this Attachment 3 by their duly authorized representatives as of the Effective Date.

**Cureous Innovations Inc.:**                           **Idaho Health Data Exchange:**

By: *Shaun T. Alfreds*                              By: *Hans C. Kastensmith*
Shaun T. Alfreds (Apr 16, 2020)                         Hans C. Kastensmith (Apr 16, 2020)
─────────────────────────                      ─────────────────────────
Shaun T. Alfreds                                        Hans Kastensmith
President & CEO                                         President & CEO

**Exhibit A**

**Fees**

1. For this SOW, during the Term, IHDE will provide payment to Contractor as follows:

   - IaaS Services to host TermAtlas™ and Smart HL7 Message Archive: MRC $15,000.00 per month.

   - Additional Network Services for Network Services not included in IHDE Connectivity:

     o Firewall Configuration and VPN Setup at $225/hour.

     o DNS Configuration at $225/hour.

     o Other network services as required at $225/hour.

   Invoicing and Payments shall be in accordance with those provisions in the Agreement.

2. A Service Credit will be due from Contractor to IHDE if any of the Service Metrics are not met during a month:

   o Data backup objective: 2% of the MRC for each failure to meet the Objective.

   o Implementation Duration Objective: 4% of the MRC for each whole week beyond the Implementation Duration Objective.

   o Incident Notification Objective: 2% of the MRC for each failure.

   o Service Availability Objective: 2% of the MRC for each whole hour of Downtime beyond the Service Availability Objective.

   o Resolution Time Objective: 2% of the MRC for failure to meet the Objective 5 times during the month, and 2% for each failure thereafter.

   o Receipt Acknowledgement Time Objective: 2% of the MRC for each failure to meet the Objective.

   The maximum combined amount of all Service Credits earned in a given calendar month may not exceed 18% of the MRC for the calendar month in which the events giving rise to the Service Credits first occurred. Contractor will apply Service Credits to the invoice immediately following its determination of Service Credit eligibility and amount.

   If IHDE disputes Contractor's calculation of Service Credits, IHDE must notify Contractor in writing, within thirty (30) days after notification of Contractor's calculation, of the basis of such dispute, in which case Contractor shall respond promptly to such notice and the Parties shall use good faith efforts to resolve such dispute in a timely manner.