Matthew T. Christensen, ISB: 7213
JOHNSON MAY
199 N. Capitol Blvd., Ste. 200
Boise, Idaho 83702
Telephone: (208) 384-8588
Facsimile:  (208) 629-2157
Email: mtc@johnsonmaylaw.com

*Attorney for Debtor in Possession*

UNITED STATES BANKRUPTCY COURT

DISTRICT OF IDAHO

| | |
|---|---|
| In re: | Case No. 22-00355-JMM |
| IDAHO HEALTH DATA EXCHANGE, INC., | Chapter 11 (Subchapter V) |
| Debtor. | |

## SUBCHAPTER V DEBTOR'S FIRST AMENDED
## PLAN OF REORGANIZATION

This First Amended Plan of Reorganization is presented to you to inform you of the proposed Plan for restructuring the debt of Idaho Health Data Exchange, Inc. ("IHDE" or the "Debtor"), and to seek your vote to accept this Plan. 11 USC § 1190.

You are encouraged to carefully review the full text of this document, including all exhibits and attachments, before deciding how to vote on this Plan.  To assist you in your review, please note that a list of definitions appears at the end of this document.

**IN ADDITION TO CASTING YOUR VOTE TO ACCEPT OR REJECT THIS PLAN, YOU MAY OBJECT TO CONFIRMATION OF THIS PLAN BY FILING AN OBJECTION WITH THE BANKRUPTCY COURT.**

Your rights may be affected by this Plan. You should consider discussing this document with an attorney.

# ARTICLE 1

## BUSINESS OPERATIONS OF THE DEBTOR

### 1.1.  Nature of the Debtor's Business and History of Business Operations of Debtor

In 2006 the Health Quality Planning Commission (HQPC) was established by the Idaho Legislature and was charged with promoting improved quality of care and health outcomes through investment in health information technology. The Idaho Health Data Exchange (IHDE) was created in 2008 to establish a statewide Health Information Exchange (HIE) as a result of the efforts of the HQPC and was funded initially through appropriations by Idaho's Legislature.  As an HIE, IHDE assists doctors, nurses, pharmacists and other health care providers and patients to appropriately access and securely share a patient's vital medical information electronically.  This helps to improve the speed, quality and safety of patient care.  IHDE provides the platform and access needed – the patients and medical providers provide the data and patient care.

In 2010, Federal American Recovery and Reinvestment Act (ARRA) enabled grant funds to be made available through Health Information Technology for Economic and Clinical Health Act (HITECH) to IHDE through appropriations under a 90%/10% program where 10% contributions from state appropriations would be matched with 90% funds from HITECH.  These funding grants provided more than 50% of IHDE's funding through 2014 with the remaining portion of funds generated from client services fees billed to healthcare participating organizations. With support from HITECH, the Idaho State Healthcare Innovation Plan (SHIP) started appropriating grant funding support in 2015 with Medicaid Healthy Connections adding incremental appropriation funding in 2016, supplying more than 60% of the total revenues generated by IHDE through 2019.

### 1.3.  Events Leading to the Filing of the Bankruptcy Case

In 2019, the IHDE board of directors understood that the HITECH Act would sunset in 2021 and was unlikely to be extended.   They were also informed that the Idaho Legislature would not continue with any matching state funds for any federal funding programs or state funded appropriations.   These funding streams had supplied more than 60% of the revenues IHDE generated since its inception, thus subsidizing the Idaho healthcare participating organizations for the first dozen years of IHDE's operations.   IHDE would have to raise fees for those existing healthcare participating organizations while restructuring and reducing IHDE's cost of operations. The objectives would require that IHDE improve its technology platform and services availability to offer services commensurate with those expected higher fees.   In order to achieve these objectives, IHDE worked with the Idaho Department of Health and Welfare (IDHW) to propose and subsequently received commitments from the Idaho Legislature for more than $16MM of appropriations in 2020 through the Federal Substance Use-Disorder Prevention that Promotes Opioid Recovery and Treatment for Patients and Communities Act (SUPPORT Act).  Together with another $4.8MM in 2020 and $4MM in 2021 from funds appropriated through the HITECH Act enhance its technical infrastructure, IHDE sought to refine its operational capability, integrate its work with the Board of Pharmacy Prescription Drug Monitoring Program (PMP), and expand its reach statewide.  The contracts were established as fixed price contracts between IHDE (i.e.,

the prime contractor) and IDHW (i.e., the client).  In total, $25MM of appropriations were committed to IHDE for specific purposes that correspondingly would position IHDE on a path to sustainable business operations for many years into the future.

During the Support Act contract execution period, IHDE experienced difficult project management relationships with certain individuals within the IDHW organization, relating to Cureous Innovation's proposed services, including installing and supporting through Software as a Service (SaaS) agreements two Cureous Innovations applications.  The difficult project management relationships overlapped with IDHW's unilateral reduction of the Support Act contract from $16.3MM to $10.5MM in contract value, with a further surprise reduction of contract value to $9MM two weeks before the expiration of the contract and after IHDE had already incurred expense and obligations associated with the eliminated $1.5MM of contract value.  In addition, the IDHW employees eliminated the appropriations for the HITECH funding that was committed to IHDE for 2020 and 2021.  To make matters even more challenging, the IDHW employees challenged the deliverables which IHDE supplied under the final $9MM contract based on documentation requirements that were either wrongly interpreted by IDHW or arbitrarily increased by department personnel to a point that exceeded CMS requirements, holding up payment for more than $700K of invoices of the reduced Support Act.  In summary, IHDE started 2020 with grant commitments of more than $25MM for 2020 and 2021 but ended 2020 with only $9MM of grant commitment in 2020 and $0 in 2021 and after having expended resources for $10.5MM of cost associated with performing on those contracts in 2020.  Of the $9MM of contracted grant commitments that IHDE was left with for which IHDE spent $10.5MM, IHDE was only paid for $8.3MM of those services until late 2021.

During the Support Act contract execution period, IHDE negotiated with IDHW to deliver to IDHW multiple years of license agreements to be paid in advance by IDHW under the Support Act contract.  Separately, IHDE attempted to negotiate 3 years of prepaid license agreements with its vendors that included Orion Health, Cureous Innovations, and KPI Ninja for their respective SaaS license agreements. IHDE successfully negotiated and contracted (i.e., executed agreements) for 3-year prepaid license agreements only with Orion Health.  IHDW personnel arbitrarily pulled approval for the KPI Ninja after IHDE had already acted on that approval and contracted with the company, placing an unreimbursed financial commitment upon IHDE.  A dispute also arose with Cureous Innovations concerning its right to prepayment.  Cureous Innovations demanded that it be paid in advance for all three years of its SaaS license agreements with IHDE using funds allegedly remitted by IDHW to IHDE specifically for that purpose.  IHDE denied that it had a binding 3-year prepayment agreement with Cureous Innovations and alleged that it had a 3-year agreement with Cureous Innovations with an option to terminate or renew the agreement at the conclusion of each year of the 3-year agreement term.  As a result of such dispute, Cureous Innovations terminated the SaaS services it was delivering to IHDE and later filed suit against IHDE in Ada County District Court, as described below.

In late 2020, reeling from having been deprived of more than $2.2MM of funds (i.e., $1.5MM of eliminated contract value plus $700k of refused invoice payments), IHDE sought out funding support from private organizations.  IHDE identified and negotiated a contracted grant commitment of $8MM with an option for further commitment from a private organization.  The private grant program required IHDE to set aside $2MM of pledged collateral as security and to

SUBCHAPTER V DEBTOR'S FIRST AMENDED PLAN OF REORGANIZATION – Page 3

execute on a program that included expanding the technology capability of the HIE, expending access to the HIE with new client connections, and subsidizing existing connections for current clients where appropriate.  During 2021, IHDE worked to execute on the program requirements while working to collect grant funds from the private organization.  While $2.4MM of the funds were distributed to IHDE, the funds were not in accordance with the required distribution schedule and were not adequate to cover the expenses IHDE was incurring to execute on the program requirements.  In early 2022 it became evident that IHDE could no longer continue to incur the expense associated with executing on the grant program requirements while not receiving promised distributions from the private organization.  IHDE negotiated a mutual conclusion to the grant program that allowed for the release of the $2MM of pledged collateral back to IHDE and release of claims from the private organization to the $2.4MM of grant funds that were distributed to IHDE during the term of the grant program.

With the grant program settled and the pledged collateral released back to IHDE, IHDE set forward on a plan to execute core operations for the remainder of 2022 and 2023 while working aggressively with existing clients to raise fees.  As of April 2022, IHDE believed that it had sufficient cash reserves and a cash management plan to be able to execute its operations through 2023, with an expectation for having secured the necessary fee increases and additional contracts to execute past 2023.  However, in May 2022 Cureous Innovations applied to the Ada County District Court and was granted a continuing prejudgment writ of attachment for the full amount of its breach of contract claim ($788,500.00) against IHDE, following which the Ada County Sheriff seized approximately $470,000.00 of operating funds from IHDEs DL Evans bank account.

This attachment, and the potential seizure of the remaining amount of Cureous Innovations' breach of contract claim against IHDE (approximately $318,500.00) from IHDE's other bank accounts pursuant to the continuing writ of attachment, resulted in IHDE suddenly and unexpectedly not having the funds available to pay existing operating expenses and in the immediate closure (by the bank) of some of IHDE's bank accounts, seriously impairing IHDE's ability to even pay employees or make critical vendor payments.  The snowball effect of the inability to pay vendors and creditors as a result of the attachment exacerbated the tight condition IHDE was already experiencing, contributing to further legal claims for nonpayment to be filed against IHDE.

In response to these circumstances, and to prevent further enforcement of the prejudgment writ of attachment, IHDE determined to seek bankruptcy protection.  The Chapter 11 filing allowed IHDE to continue to provide its critical and essential services for the healthcare community and citizens in the State of Idaho while more efficiently resolving all outstanding contract disputes through an orderly and structured process in federal court.  The Chapter 11 filing also allows IHDE to work to pay creditors while simultaneously working through a restructuring plan that assures IHDE continued progress towards its primary goal of sustainable business operations.

### 1.4.  Filed Monthly Operating Reports

IHDE has filed monthly operating reports that detail the revenue, expenses, and other financial events during the course of the case.  These reports are available for review by contacting

IHDE's counsel or by online access through PACER.  The most recent Monthly Operating Report is attached to this Plan as ***Exhibit A***.[1]

### 1.5.  Unusual or Significant Events During the Bankruptcy Case

The Debtor has successfully employed counsel in this case, and is otherwise actively seeking to get this Plan confirmed.  Additionally, IHDE sought to recover the $470,000.00 that was attached from its bank accounts and objected to CI's claim.  This recovery and objection is being pursued through Adversary Case No. 22-06018-JMM.  However, IHDE and CI have agreed to a compromise of the issues, which results in IHDE recovering approximately $235,000.00 of the attached funds, and CI waiving and releasing any further claims against IHDE or its bankruptcy estate.  The full terms of the compromise are described in the attached ***Exhibit B***.  As of the date of this Amended Plan, the compromise is pending bankruptcy court approval.

## ARTICLE 2

## TREATMENT OF CLAIMS, LIENS AND INTERESTS UNDER THE PLAN

The Debtor's Plan describes how its Creditors will be paid.

As required by the Bankruptcy Code under § 1123(a)(1), this Plan places Claims and Equity Interests in various classes and describes the treatment each class will receive.  This Plan also states whether each class of Claims or Equity Interests is impaired or unimpaired.  If this Plan is confirmed, each Creditor's recovery is limited to the amount provided in this Plan.

Only Creditors in classes that are impaired may vote on whether to accept or reject this Plan, and only Creditors holding Allowed Claims may vote.  A class that is not impaired is deemed to accept this Plan.

### 2.1.  Unclassified Claims

Certain types of Claims are automatically entitled to specific treatment under the Code.  They are not considered impaired, and holders of such Claims do not vote on this Plan.  They may, however, object if, in their view, their treatment under this Plan does not comply with that required by the Code.  As such, this Plan does not place the following Claims in any class:

### A. Administrative Expenses

Except as otherwise provided under the Plan, each holder of an Administrative Expense claim allowed under § 503 of the Code will be paid in full on the Effective Date of the Plan, in cash, or upon such other terms as may be agreed upon by the holder of the claim and the Debtor or as approved by the Court.  If an Administrative Expense is disputed, payment will be made after

---

[1] Please note that, in order to save paper, the Monthly Operating Report attached here does not contain any of the exhibits to the report (bank statements, reconciliation reports, etc.).  A full copy of the Monthly Operating Report can be found on the court's Pacer website: www.pacer.gov.

the Court resolves the dispute and determines the amount of the allowed Administrative Expense. In the event this Plan is confirmed under §1191(b), the Plan may provide for payment of claims specified in paragraph (2) or (3) of 11 U.S.C. §507(a) through the Plan, rather than paid in full on the Effective Date of the Plan. **You should examine the proposed treatment of your claim carefully**.

The following chart lists the Debtor's estimated Administrative Expenses and their proposed treatment under this Plan:

| Type | Estimated Amount Owed | Proposed Treatment |
|---|---|---|
| Professional fees, as approved by the Bankruptcy Court | $50,000.00 (Attorney Fees) | After Bankruptcy Court approval, Payment through this Plan as follows:  Full payment on the Effective Date. |
| Other Administrative Expenses (please describe) | None | Payment through this Plan as follows:  None. |
| Trustee | $6,500.00 (SubV Trustee) | Upon application under § 330 and after Bankruptcy Court approval, payment through this Plan as follows: Full payment on the Effective Date. |
| TOTAL | $56,500.00 | |

B.  Priority Tax Claims

| Name of Taxing Authority and Type of Tax | Estimated Amount Owed | Date of Assessment | Treatment |
|---|---|---|---|
| None | | | |

SUBCHAPTER V DEBTOR'S FIRST AMENDED PLAN OF REORGANIZATION – Page 6

| None | | | |
|------|--|--|--|
| | | | |

Each holder of a Priority Tax Claim pursuant to § 507(a)(8) will be paid as set forth in the chart below:

2.2.  Classes of Claims and Equity Interests

The following are the classes set forth in this Plan and the proposed treatment they will receive under this Plan:

A.  Classes of Secured Claims

The following chart lists all classes containing the Debtor's secured prepetition Claims and their proposed treatment under this Plan:

| Class # | Description | Insider? (Yes or No) | Impairment | Treatment |
|---------|-------------|----------------------|------------|-----------|
| 1 | Claim of Cureous Innovations | No | Yes | Assuming the bankruptcy court approves the terms of the compromise between IHDE and Cureous Innovations, Cureous will retain $235,000.00 of the funds currently being held by the Ada County Sheriff, and will waive and release any further claim against IHDE. Specific terms of the compromise are outlined in Exhibit B. |

2.2.A.1.  <u>Waiver of Secured Status and Lien Rights by Claimants</u>. In the event any of the claimants listed or scheduled as secured file a proof of claim stating that no part of the claim is secured, then the claim shall be deemed entirely unsecured and treated as such pursuant to this Plan.

2.2.A.2.  <u>Proof of Claim Controls Over Amount Scheduled by Debtor(s)</u>. The amount listed on a timely filed proof of claim (subject to allowance of the claim) shall control over any contrary amount listed in the Debtor's schedules and deemed filed pursuant to 11 U.S.C. § 1111(a).

B.  <u>Classes of Priority Unsecured Claims</u>

The following chart lists all classes containing Claims under §§ 507(a)(1), (4), (5), (6), and (a)(7) of the Code and their proposed treatment under this Plan:

| Class # | Description | Impairment | Treatment |
|---------|-------------|------------|-----------|
|  | None |  | None |

/
/
/
/
/
/
/
/
/
/
/
/
/
/
/
/
/
/
/
/
/
/
/
/

C.   <u>Classes of General Unsecured Claims</u>

The following chart identifies this Plan's proposed treatment of Class 2, which contain general unsecured Claims against the Debtor. 11 USC § 502:

| Class # | Description | Impairment | Treatment |
|---------|-------------|------------|-----------|
| 2 | Orion Health | Impaired | This class consists of the portion of Orion Health obligation that was a separate promissory note. This promissory note obligation remained as a separate obligation in the most-recent addendum between the Debtor and Orion, and is tied to Orion's and the Debtor's continued obligations under the executory contract with Orion.  The note obligation is unsecured, but because it is tied to continued performance by Orion under it's executory contract, it is classified separately from other unsecured creditors (which do not have the same continued performance contingencies). The Debtor proposes the treatment of Orion's claim as outlined in the Stipulation Regarding Plan Treatment of Orion Health, Inc., (Doc. 46), a copy of which is attached here as ***Exhibit E***. |

| 3 | General Unsecured Class | Impaired | The Debtor will make a monthly payment of $4,000.00 to creditors in this class (split pro-rata between all creditors with allowed claims) for a period of sixty months. |

### D.  Class of Equity Security Holders and the Debtor

The following chart sets forth this Plan's proposed treatment of the class(es) of Equity Security Holders and the Debtor itself:

| Class # | Description | Impairment | Treatment |
|---|---|---|---|
|  | Equity Security Holders | None | None |
| 4 | Debtor | Unimpaired | Debtor shall retain all assets and income, except as outlined in this Plan. |

### 2.3.    Estimated Number and Amount of Claims Objections

The Debtor may object to the amount or validity of any Claim within 60 days of the Confirmation Date by filing an objection with the Bankruptcy Court and serving a copy of the objection on the holder of the Claim. The Claim objected to will be treated as a Disputed Claim under this Plan.  If and when a Disputed Claim is finally resolved by the allowance of the Claim in whole or in part, the Debtor will pay the Allowed Claim in accordance with this Plan.

| Class | Number of Claims Objected To | Amount of Claims Objected To |
|---|---|---|
| 1 | Claim No. 2 (Cureous Innovations) | $958,110.54[2] |
|  |  |  |

---

[2] While the claim objection remains pending as of the date of this First Amended Plan, IHDE anticipates court approval of a compromise with Cureous Innovations, which will result in a payment to Cureous Innovations of $235,000.00, and waiver by Cureous Innovations of any further claim amount.

2.4.    Treatment of Executory Contracts and Unexpired Leases

Executory Contracts are contracts where significant performance of the contract remains for both the Debtor and another party to the contract. The Debtor has the right to reject, assume (i.e. accept), or assume and assign these types of contracts to another party, subject to the Bankruptcy Court's approval. The paragraphs below explain the Debtor's intentions regarding its Executory Contracts (which includes its unexpired leases) and the impact such intentions would have on the other parties to the contracts.

Check all that apply:

[ X ] Assumption of Executory Contracts.

The Executory Contracts shown on ***Exhibit C*** shall be assumed by the Debtor. Assumption means that the Debtor have elected to continue to perform the obligations under such contracts and unexpired leases, and to cure defaults of the type that must be cured under the Bankruptcy Code, if any. Exhibit C also lists how the Debtor will cure and compensate the other party to such contract or lease for any such defaults.

If you object to the assumption of your unexpired lease or executory contract, the proposed cure of any defaults, or the adequacy of assurance of future performance, you must file and serve your objection to the assumption within the deadline for objecting to the confirmation of this Plan, unless the Bankruptcy Court has set an earlier time.

OR

[ ] Assumption and Assignment of Executory Contracts and Unexpired Leases.

The Executory Contracts shown on Exhibit C shall be assumed by the Debtor and assigned to the party listed in that Exhibit. Assumption and assignment by the Debtor means that the Debtor will undertake the obligations under such contracts and unexpired leases, will cure defaults of the type that must be cured under the Bankruptcy Code, if any, and will assign the contract to the party listed.

If you object to the assumption and assignment of your unexpired lease or executory contract, the proposed cure of any defaults, or the adequacy of assurance of future performance, you must file and serve your objection to the assumption and assignment within the deadline for objecting to the confirmation of this Plan, unless the Bankruptcy Court has set an earlier time.

AND/OR

[ ] Rejection of Executory Contracts and Unexpired Leases.

Rejection means that the Debtor has elected not to continue to perform the obligations under such contracts or leases. If the Debtor has elected to reject a contract or lease, the other party to the contract or lease will be treated as an unsecured Creditor holding a Claim that arose before the bankruptcy was filed.

Except for executory contracts and unexpired leases that have been assumed, and if applicable assigned, before the Effective Date, or that are the subject of a pending motion to assume, and if applicable assign, the Debtor will be conclusively deemed to have rejected all executory contracts and unexpired leases as of the Effective Date. **Any creditors that believe they hold claims with respect to contracts rejected hereunder shall file a proof of claim on or before thirty (30) days after Confirmation of this Plan**. Any such timely filed allowed claims will participate in the distribution for General Unsecured Creditors set out within this Plan. Any Claim based on the rejection of an Executory Contract will be barred if the proof of claim is not timely filed unless the Bankruptcy Court orders otherwise.

### 2.5.    Projected Recovery of Avoidable Transfers

The Debtor was pursuing avoidance and recovery of the $470,000.00 attached by Cureous Innovations prior to the bankruptcy filing. Based on the compromise with Cureous Innovations, the Debtor anticipates recovering $235,000.00 of those sums, which will be used to fund the Debtor's plan.

### 2.6.    Payments

If this Plan is confirmed under § 1191(a), payments to Creditors provided for in this Plan will be made directly by the Debtor and shall not be paid through the subchapter V Trustee except as otherwise provided in this Plan or in the order confirming this Plan.

If this Plan is confirmed under § 1191(b), payments to creditors under this Plan will be made by the Debtor and not paid through the subchapter V Trustee.

### 2.7.    Means for Implementation of the Plan

The Debtor intends to fund its plan through regular monthly payments to creditors. These monthly payments will be made from the income the Debtor receive from the operation of its business.

As outlined above, the Debtor anticipates all distributions to creditors will be made by the Debtor, with no distributions by the subchapter V Trustee. The Debtor anticipates the compensation for the subchapter V Trustee will be on an hourly basis for his work monitoring this case. In the event the subchapter V Trustee is required to make distributions to creditors, the Debtor anticipates the Trustee will receive a maximum administrative commission for those distributions equivalent to two percent (2%) of the funds received and disbursed after Confirmation, plus additional compensation on an hourly basis for performing other statutory duties related to this case; and that Plan Payments will be made from the Debtor to the Trustee through Electronic Funds Transfers (EFTs) or other medium of efficient monetary transactions from the Debtor to the Trustee, as agreed and arranged between them.

In the event the Debtor is unable to make a payment under the terms of this Plan, the Debtor shall <u>not</u> be in default under the terms of this Plan until at least two (2) months of nonpayments have occurred.  In the event two months of non-payment have occurred, the Debtor shall begin to liquidate the assets in its possession to make required payments.  In the event the liquidation of assets is not sufficient to cure the default in payments, any party shall be entitled to petition the Court to convert this case to one proceeding under Chapter 7 of the Bankruptcy Code.

The Debtor reserves the right to prepay any claim, in part, or in full, while this Plan is in effect.

### 2.8.    Post-Confirmation Management

The Post-Confirmation Officers/Managers of the Debtor and their compensation shall be as follows:

| Name | Position | Compensation |
|---|---|---|
| Jesse Meldru | Interim Executive Director/ Director of Finance | $10,000.00/month |

### 2.9.    Tax Consequences of this Plan

**CREDITORS AND EQUITY INTEREST HOLDERS CONCERNED WITH HOW THIS PLAN MAY AFFECT THEIR TAX LIABILITY SHOULD CONSULT WITH THEIR OWN ACCOUNTANTS, ATTORNEYS, AND/OR ADVISORS.**

### 2.10.    Projections in Support of Debtor' Ability to Make Payments Under the Proposed Plan

Debtor have provided projected financial information. Those projections are listed on the attached ***Exhibit D***.

## ARTICLE 3

## FEASIBILITY OF PLAN

### 3.1.    Ability to Initially Fund Plan

The Debtor believes that the Debtor will have enough cash on hand on the Effective Date of this Plan to pay all the Claims and expenses that are entitled to be paid on that date.  The Debtor anticipates holding approximately $343,000.00 on the Effective Date.  Further plan payments will be paid from continuing operating funds of the Debtor and recovery of preference transfer funds. The ability to meet future plan obligations is dependent on the Debtor maintaining an adequate

cash surplus during the early part of the plan period such that there is adequate cash margin during the low-cash part of the plan period caused by constraints on invoice timing.

3.2.    Ability to Make Future Plan Payments And Operate Without Further Reorganization

The Debtor must submit all or such portion of the future earnings or other future income of the Debtor as is necessary for the execution of this Plan.

The Debtor has provided projected financial information. Those projections are listed in Exhibit D.  The Debtor's financial projections show that the Debtor will have an aggregate annual average cash flow, after paying its expenses and post-confirmation taxes (including plan payments), of approximately $32,000.00 (averaged year over year). The final Plan payment is expected to be paid within sixty (60) months of the Effective Date (estimated to be June 2028, if plan confirmation occurs in May 2023).  Based on the Debtor's projections, it estimates payments to general unsecured creditors will be a total of approximately $240,000.00.  Based on the current claim amounts, the Debtor estimate payments of approximately 24% of total claim amount to the creditors in class 3 (general unsecured creditors).

**YOU SHOULD CONSULT WITH YOUR ACCOUNTANT OR OTHER FINANCIAL ADVISOR IF YOU HAVE ANY QUESTIONS PERTAINING TO THESE PROJECTIONS.**

## ARTICLE 4

## LIQUIDATION ANALYSIS

To confirm this Plan, the Bankruptcy Court must find that all Creditors and Equity Interest holders who do not accept this Plan will receive at least as much under this Plan as such Claimants and Equity Interest holders would receive in a Chapter 7 liquidation. See 11 U.S.C. §1129(a)(7) and 11 USC § 1190(1)(B).  A liquidation analysis is attached hereto as ***Exhibit F***.  The liquidation analysis included analysis *without* the approval of the Cureous Innovations settlement, and *with* the Cureous Innovations settlement approval.  Also included in Exhibit F is a spreadsheet showing the various creditor claims and the potential recovery scenarios under plan confirmation or liquidation.

## ARTICLE 5

## DISCHARGE

**If this Plan is confirmed under § 1191(a),** on the Confirmation Date of this Plan, the Debtor will be discharged from any debt that arose before confirmation of this Plan, subject to the occurrence of the Effective Date, to the extent specified in § 1141(d) of the Bankruptcy Code; or

**If this Plan is confirmed under § 1191(b),** as soon as practicable after completion by the Debtor of all payments due under this Plan, unless the court approves a written waiver of discharge executed by the Debtor after the order for relief under this chapter, the court shall grant the Debtor a discharge of all debts provided in section 1141(d)(1)(A) of this title, and all other debts allowed under section 503 of the Bankruptcy Code and provided for in this Plan, except any debt—

    (1) on which the last payment is due after the first 3 years of this Plan, or such other time not to exceed 5 years fixed by the court; or

    (2) if applicable, of the kind specified in section 523(a) of the Bankruptcy Code.

## ARTICLE 6

## GENERAL PROVISIONS

### 6.1.    Title to Assets

If a plan is confirmed under § 1191(a), except as otherwise provided in this Plan or in the order confirming this Plan, (i) confirmation of this Plan vests all of the property of the estate in the Debtor, and (ii) after confirmation of this Plan, the property dealt with by this Plan is free and clear of all Claims and Equity Interests of Creditors, Equity Security Holders, and of general partners in the Debtor (if any).

If a plan is confirmed under § 1191(b), property of the estate includes, in addition to the property specified in § 541, all property of the kind specified in that section that the Debtor acquires, as well as earnings from services performed by the Debtor, after the date of commencement of the case but before the case is closed, dismissed, or converted to a case under chapter 7, 12, or 13 of the Bankruptcy Code, whichever occurs first. Except as provided in § 1185 of the Bankruptcy Code, this Plan, or the order confirming this Plan, the Debtor shall remain in possession of all property of the estate.

### 6.2.    Binding Effect

**IF THIS PLAN IS CONFIRMED, THE PROVISIONS OF THIS PLAN WILL BIND THE DEBTOR AND ALL CREDITORS, WHETHER OR NOT THEY ACCEPT THIS PLAN. THE RIGHTS AND OBLIGATIONS OF ANY ENTITY NAMED OR REFERRED TO IN THIS PLAN WILL BE BINDING UPON, AND WILL INURE TO THE BENEFIT OF, THE SUCCESSORS OR ASSIGNS OF SUCH ENTITY.**

### 6.3.    Release of Claims

The consideration to be distributed under the Plan shall be in exchange for, and in complete satisfaction and release of, all claims against the Debtor or any of their assets or properties, including without limitation any claim accruing after the Petition Date and prior to the Effective Date.

6.4.    Permanent Injunction

Except as otherwise expressly provided in, or permitted under, this Plan, the Confirmation order shall provide, among other things, that all claimants and persons who have held, hold or may hold claims that existed prior to the Effective Date, are permanently enjoined on and after the Effective Date against the: (i) commencement or continuation of any judicial, administrative, or other action or proceeding against the Debtor on account of claims against the Debtor, or on account of claims released by this Plan; (ii) enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree, or order against the Debtor or any property; or (iii) creation, perfection or enforcement of any encumbrance of any kind against the Debtor arising from a claim. This provision does not enjoin the prosecution of any claims that arise on or after the Effective Date nor does it enjoin the determination in the Bankruptcy Court of the amount of any claims that arose prior to the Effective Date. Claimants and parties asserting entitlement to payment of administrative claims incurred prior to the date of Confirmation shall be permanently enjoined from asserting any Claim against the Debtor or their retained assets based upon any act or omission, transaction or other activity that occurred prior to the Confirmation date, except as otherwise provided in the Plan, whether or not a proof of claim or interest was filed and whether or not such claim or interest is allowed under Section 502 of the Code.

6.5.    Severability

If any provision in this Plan is determined to be unenforceable, the determination will in no way limit or affect the enforceability and operative effect of any other provision of this Plan.

6.6.    Retention of Jurisdiction by the Bankruptcy Court

The Bankruptcy Court shall retain jurisdiction of this case with regard to the following matters: (i) to make such orders as are necessary or appropriate to implement the provisions of this Plan and to resolve any disputes arising from implementation of this Plan; (ii) to rule on any modification of this Plan proposed under section 1193; (iii) to hear and allow all applications for compensation to professionals and other Administrative Expenses; (iv) to resolve all issues regarding Claims objections, and issues arising from the assumption/rejection of executory contracts or unexpired leases, and (v) to adjudicate any cause of action which may exist in favor of the Debtor, including preference and fraudulent transfer causes of action.

6.7.    Captions

The headings contained in this Plan are for convenience of reference only and do not affect the meaning or interpretation of this Plan.

6.8.    Modification of Plan

The Debtor may modify this Plan at any time before confirmation of this Plan pursuant to § 1193(a). However, the Bankruptcy Court may require additional items including new votes on this Plan.

If this Plan is confirmed under Section 1191(a), the Debtor may also seek to modify this Plan at any time after confirmation only if (1) this Plan has not been substantially consummated *and* (2) the Bankruptcy Court authorizes the proposed modifications after notice and a hearing.

If this Plan is confirmed under Section 1191(b), the Debtor may seek to modify this Plan at any time only if (1) it is within 3 years of the Confirmation Date, or such longer time not to exceed 5 years, as fixed by the court *and* (2) the Bankruptcy Court authorizes the proposed modifications after notice and a hearing.

### 6.9.    Final Decree

Once the estate has been fully administered, as provided in Rule 3022 of the Federal Rules of Bankruptcy Procedure, the Debtor, or such other party as the Bankruptcy Court shall designate in the Plan Confirmation Order, shall file a motion with the Bankruptcy Court to obtain a final decree to close the case. Alternatively, the Bankruptcy Court may enter such a final decree on its own motion.

### 6.10.    Professional Fees after Confirmation

In the period after the date of Confirmation, but before closing of the case, the Reorganized Debtor may continue to avail itself of the services of professional persons whose employment was approved at or prior to the date of Confirmation in completing administration of the case and in the consummation and performance of the Plan and, if necessary, employ additional professional persons to render services in and in connection with the case. With respect to services rendered and expenses incurred in or in connection with the case by any professional person during such period, the professional person may render periodic billing thereafter to the disbursing agent identified in §2.6 above,  who shall promptly pay the same, but each such payment shall be subject to review and approval by the Court as to the reasonableness thereof, as set forth herein. In any *Motion for Final Decree*, the Reorganized Debtor shall detail all amounts paid during such period to professional persons as compensation for services rendered or reimbursement of expenses incurred, with respect to which no prior application for allowance thereof has been made to the Court. At any hearing upon the Reorganized Debtor's *Motion for Final Decree*, the Court shall consider and determine whether or not such payments shall be approved as reasonable.

### 6.11.    Closing of the Case

After the Effective Date, upon the payment of all outstanding administrative claims and the commencement of payments to priority creditors and secured claimants, the Reorganized Debtor will seek an Order closing the case through the filing of a final accounting and a motion for a final decree as required under Bankruptcy Rule 3022.

### 6.12.    Continued Execution of the Plan after Closing

After closing of the case, the Reorganized Debtor shall remit all Plan Payments to the appropriate holders of allowed claims provided for in the Plan. Upon all payments having been distributed, the Reorganized Debtor shall be authorized to reopen the case, satisfy any additional requirements under the Code and receive a discharge (if applicable).

6.13.   Professional Fees after Closing

After closing of the case, the Reorganized Debtor may continue to avail themselves to the services of professional persons whose employment was approved at or prior to closing of the case in performance of the Plan. In the event such professional services are rendered, or expenses are incurred by any professional person therewith, an itemized bill shall be furnished by such professional person to the Reorganized Debtor, who shall promptly pay the same, subject to any objection being raised by the Reorganized Debtor, or the Trustee, in the event the Trustee remains in place to receive and distribute funds under the Plan. Pursuant to Section 6.6 of this Plan, the Court will retain jurisdiction to review the reasonableness of each such payment in the event of such an objection or dispute.

## ARTICLE 7

## DEFINITIONS

The definitions and rules of construction set forth in §§ 101 and 102 of the Bankruptcy Code shall apply when terms defined or construed in the Code are used in this Plan.  Any definitions that follow that are found in the Code are for convenience of reference only, and are superseded by the definitions found in the Code.

7.1.    Administrative Claimant:  Any person entitled to payment of an Administration Expense.

7.2.    Administrative Convenience Class:  A class consisting of every unsecured claim that is less than or reduced to an amount that the Bankruptcy Court approves as reasonable and necessary for administrative convenience pursuant to § 1122(b).

7.3.    Administrative Expense: Any cost or expense of administration of the Chapter 11 case entitled to priority under § 507(a)(2) of the Code and allowed under § 503(b) of the Code, including without limitation, any actual and necessary expenses of preserving the Debtor's estate, any actual and necessary expenses incurred following the filing of the bankruptcy petition by the Debtor-in-Possession, allowances of compensation or reimbursement of expenses to the extent allowed by the Bankruptcy Court under the Bankruptcy Code, the allowed claim of the Trustee for fees and/or reimbursements, and any fees or charges assessed against any of the Debtor' estates under Chapter 123, Title 28, United States Code.

7.4.    Administrative Tax Claim:  Any tax incurred pursuant to § 503(b)(1)(B) of the Code.

7.5.    Allowed Claim: Any claim against the Debtor pursuant to § 502 of the Code to the extent that: (a) a Proof of Claim was either timely filed or was filed late with leave of the Bankruptcy Court or without objection by the Debtor, and (b) as to which either (i) a party in interest, including the Debtor, does not timely file an objection, or (ii) is allowed by a Final Order.

SUBCHAPTER V DEBTOR'S FIRST AMENDED PLAN OF REORGANIZATION – Page 18

7.6.     Allowed Priority Tax Claim: A Priority Tax Claim to the extent that it is or has become an Allowed Claim, which in any event shall be reduced by the amount of any offsets, credits, or refunds to which the Debtor or Debtor-in-Possession shall be entitled on the Confirmation Date.

7.7.     Allowed Secured Claim: Allowed Secured Claims are claims secured by property of the Debtor's bankruptcy estate (or that are subject to setoff) to the extent allowed as secured claims under § 506 of the Code.

7.8.     Allowed Unsecured Claim: An Unsecured Claim to the extent it is, or has become, an Allowed Claim, which in any event shall be reduced by the amount of any offsets, credits, or refunds to which the Debtor or Debtor-in-Possession shall be entitled on the Confirmation Date.

7.9.     Bankruptcy Code or "Code": The Bankruptcy Reform Act of 1978, as amended and codified as Title 11, United States Code.

7.10.    Bankruptcy Court: The United States Bankruptcy Court for the District of Idaho.

7.11.    Bankruptcy Rules:  The Federal Rules of Bankruptcy Procedure.

7.12.    Chapter 11 Case: This case under chapter 11 of the Bankruptcy Code in which Idaho Health Data Exchange is the Debtor-in-Possession.

7.13.    Claim: Any "right to payment from the Debtor whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured; or any right to an equitable remedy for future performance if such breach gives rise to a right of payment from the Debtor, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, disputed, undisputed, secured or unsecured." 11 U.S.C. § 101(5).

7.14.    Class: A category of holders of claims or interests which are substantially similar to the other claims or interests in such class.

7.15.    Confirmation: The entry by the Bankruptcy Court of an order confirming this Plan.

7.16.    Confirmation Date: The Date upon which the Bankruptcy Court shall enter the Confirmation Order; provided however, that if on motion the Confirmation Order or consummation of this Plan is stayed pending appeal, then the Confirmation Date shall be the entry of the Final Order vacating such stay or the date on which such stay expires and is no longer in effect.

7.17.    Confirmation Hearing: The hearing to be held to consider confirmation of this Plan.

7.18.    Confirmation Order:  An order of the Bankruptcy Court or any amendment thereto confirming this Plan in accordance with the provisions of chapter 11 of the Bankruptcy Code.

7.19.    Creditor:  Any person who has a Claim against the Debtor that arose on or before the Petition Date.

7.20.    Debtor and Debtor-in-Possession:  Idaho Health Data Exchange, Inc., the Debtor-in-possession in this Chapter 11 Case.

7.21.    Disputed Claim:  Any claim against the Debtor pursuant to § 502 of the Code that the Debtor have in any way objected to, challenged or otherwise disputed.

7.22.    Distributions:  The property required by this Plan to be distributed to the holders of Allowed Claims.

7.23.    Effective Date:  shall mean the later of (i) the fourteenth calendar day of the first full month following entry of the Confirmation Order, or (ii) the first business day after an appeal of the Confirmation Order has become final and unappealable. However, the Debtor may at any time designate an earlier Effective Date by filing written notice thereof with the Court and serving such notice on all creditors and parties in interest.

7.24.    Equity Security Holder:  A person or entity that has an ownership interest in the Debtor (if any).

7.25.    Executory Contracts:  All unexpired leases and executory contracts as described in Section 365 of the Bankruptcy Code.

7.26.    Final Order:  An order or judgment of the Bankruptcy Court that has not been reversed, stayed, modified or amended and as to which (a) any appeal that has been taken has been finally determined or dismissed, or (b) the time for appeal has expired and no notice of appeal has been filed.

7.27.    General Unsecured Creditor: A Creditor that holds a Claim in the Chapter 11 case which is not a secured Claim and which is classed in Class 3.

7.28.    IRC:  The Internal Revenue Code

7.29.    Petition Date:  August 12, 2022, the date the chapter 11 petition for relief was filed.

7.30.    Plan:  This Plan, either in its present form or as it may be altered, amended, or modified from time to time.

7.31.    Priority Tax Claim:  Any Claim entitled to priority in payment under Section 507(a)(8) of the Bankruptcy Code.

7.32.    Reorganized Debtor(s):  The Debtor after the Effective Date.

7.33.    Schedules:  Schedules and Statement of Financial Affairs, as amended, filed by the Debtor with the Bankruptcy Court listing liabilities and assets.

7.34.    Secured Creditor:  Any creditor that holds a Claim that is secured by property of the Debtor.

7.35.    Trustee:  Matthew Grimshaw, the trustee appointed pursuant to 11 U.S.C. § 1183(a) and whose duties are prescribed under 11 U.S.C. § 1183(b), this Plan, or the order confirming this Plan.

7.36.    Unsecured Creditor:  Any Creditor that holds a Claim in the Chapter 11 case which is not a secured Claim.

DATED this 28th day of March, 2023.

By:   /s/ Jesse Meldru
Idaho Health Data Exchange, Debtor
By: Jesse Meldru, Director of Finance

DATED this 28th day of March, 2023.

By:   /s/ Matt Christensen
Matthew T. Christensen
Counsel for the Debtor

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 29th day of March, 2023, I filed the foregoing SUBCHAPTER V DEBTOR'S FIRST AMENDED PLAN OF REORGANIZATION electronically through the CM/ECF system, which caused the following parties to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

| | |
|---|---|
| Matthew T. Christensen | mtc@johnsonmaylaw.com |
| U.S. Trustee | ustp.region18.bs.ecf@usdoj.gov |
| Matthew W. Grimshaw | matt@grimshawlawgroup.com |
| Chad R. Moody | crm@johnsonmaylaw.com |
| J.B. Evans | jb.evans@stoel.com |
| Jaclyn T. Gans | jtg@elamburke.com |
| Nicole C. Hancock | nicole.hancock@stoel.com |
| Sheila R. Schwager | sschwager@hawleytroxell.com |

Any others as listed on the Court's ECF Notice.

/s/ Matt Christensen
Matthew T. Christensen

# EXHIBIT A
(Latest Monthly Operating Report)

| Fill in this information to identify the case: |
| --- |
| Debtor Name __Idaho Health Data Exchange__ |
| United States Bankruptcy Court for the: __District of Idaho__ |
| Case number: __22-00355-JMM__ |

☐ Check if this is an amended filing

## Official Form 425C

## Monthly Operating Report for Small Business Under Chapter 11    12/17

| | | | |
| --- | --- | --- | --- |
| Month: | __February 2023__ | Date report filed: | __03/21/2023__<br>MM / DD / YYYY |
| Line of business: | __Data Processing__ | NAISC code: | __518210__ |

In accordance with title 28, section 1746, of the United States Code, I declare under penalty of perjury that I have examined the following small business monthly operating report and the accompanying attachments and, to the best of my knowledge, these documents are true, correct, and complete.

| | |
| --- | --- |
| Responsible party: | Jesse Meldru |
| Original signature of responsible party | |
| Printed name of responsible party | Jesse Meldru |

### ◼ 1. Questionnaire

Answer all questions on behalf of the debtor for the period covered by this report, unless otherwise indicated.

| | | Yes | No | N/A |
| --- | --- | :-: | :-: | :-: |
| | **If you answer *No* to any of the questions in lines 1-9, attach an explanation and label it *Exhibit A*.** | | | |
| 1. | Did the business operate during the entire reporting period? | ☑ | ☐ | ☐ |
| 2. | Do you plan to continue to operate the business next month? | ☑ | ☐ | ☐ |
| 3. | Have you paid all of your bills on time? | ☑ | ☐ | ☐ |
| 4. | Did you pay your employees on time? | ☑ | ☐ | ☐ |
| 5. | Have you deposited all the receipts for your business into debtor in possession (DIP) accounts? | ☐ | ☑ | ☐ |
| 6. | Have you timely filed your tax returns and paid all of your taxes? | ☑ | ☐ | ☐ |
| 7. | Have you timely filed all other required government filings? | ☑ | ☐ | ☐ |
| 8. | Are you current on your quarterly fee payments to the U.S. Trustee or Bankruptcy Administrator? | ☑ | ☐ | ☐ |
| 9. | Have you timely paid all of your insurance premiums? | ☑ | ☐ | ☐ |
| | **If you answer *Yes* to any of the questions in lines 10-18, attach an explanation and label it *Exhibit B*.** | | | |
| 10. | Do you have any bank accounts open other than the DIP accounts? | ☑ | ☐ | ☐ |
| 11. | Have you sold any assets other than inventory? | ☐ | ☑ | ☐ |
| 12. | Have you sold or transferred any assets or provided services to anyone related to the DIP in any way? | ☐ | ☑ | ☐ |
| 13. | Did any insurance company cancel your policy? | ☐ | ☑ | ☐ |
| 14. | Did you have any unusual or significant unanticipated expenses? | ☐ | ☑ | ☐ |
| 15. | Have you borrowed money from anyone or has anyone made any payments on your behalf? | ☐ | ☑ | ☐ |
| 16. | Has anyone made an investment in your business? | ☐ | ☑ | ☐ |

Debtor Name __Idaho Health Data Exchange__                    Case number __22-00355-JMM__

17. Have you paid any bills you owed before you filed bankruptcy?                    ☐ ☑ ☐
18. Have you allowed any checks to clear the bank that were issued before you filed bankruptcy?    ☐ ☑ ☐

## 2. Summary of Cash Activity for All Accounts

19. **Total opening balance of all accounts**

    This amount must equal what you reported as the cash on hand at the end of the month in the previous
    month. If this is your first report, report the total cash on hand as of the date of the filing of this case.                    $ 274,670.96

20. **Total cash receipts**

    Attach a listing of all cash received for the month and label it *Exhibit C*. Include all
    cash received even if you have not deposited it at the bank, collections on
    receivables, credit card deposits, cash received from other parties, or loans, gifts, or
    payments made by other parties on your behalf. Do not attach bank statements in
    lieu of *Exhibit C*.

    Report the total from *Exhibit C* here.                    $ 504,792.88

21. **Total cash disbursements**

    Attach a listing of all payments you made in the month and label it *Exhibit D*. List the
    date paid, payee, purpose, and amount. Include all cash payments, debit card
    transactions, checks issued even if they have not cleared the bank, outstanding
    checks issued before the bankruptcy was filed that were allowed to clear this month,
    and payments made by other parties on your behalf. Do not attach bank statements
    in lieu of *Exhibit D*.

    Report the total from *Exhibit D* here.                    – $ 291,843.81

22. **Net cash flow**

    Subtract line 21 from line 20 and report the result here.
    This amount may be different from what you may have calculated as *net profit*.                    + $ 212,949.07

23. **Cash on hand at the end of the month**

    Add line 22 + line 19. Report the result here.                    = $ 487,620.03

    Report this figure as the *cash on hand at the beginning of the month* on your next operating report.

    This amount may not match your bank account balance because you may have outstanding checks that
    have not cleared the bank or deposits in transit.

## 3. Unpaid Bills

Attach a list of all debts (including taxes) which you have incurred since the date you filed bankruptcy but
have not paid. Label it *Exhibit E*. Include the date the debt was incurred, who is owed the money, the
purpose of the debt, and when the debt is due. Report the total from *Exhibit E* here.

24. **Total payables**                    $ 70,333.39

    *(Exhibit E)*

Debtor Name **Idaho Health Data Exchange**    Case number **22-00355-JMM**

---

### 4. Money Owed to You

Attach a list of all amounts owed to you by your customers for work you have done or merchandise you have sold. Include amounts owed to you both before, and after you filed bankruptcy.  Label it *Exhibit F*. Identify who owes you money, how much is owed, and when payment is due. Report the total from *Exhibit F* here.

25. **Total receivables**                                                               $  218,639.25

   *(Exhibit F)*

---

### 5. Employees

26. What was the number of employees when the case was filed?                                    2
27. What is the number of employees as of the date of this monthly report?                        2

---

### 6. Professional Fees

28. How much have you paid this month in professional fees related to this bankruptcy case?        $  0.00
29. How much have you paid in professional fees related to this bankruptcy case since the case was filed?   $  0.00
30. How much have you paid this month in other professional fees?                                 $  0.00
31. How much have you paid in total other professional fees since filing the case?                $  0.00

---

### 7. Projections

Compare your actual cash receipts and disbursements to what you projected in the previous month. Projected figures in the first month should match those provided at the initial debtor interview, if any.

| | Column A | | Column B | | Column C |
|---|---|---|---|---|---|
| | **Projected** | — | **Actual** | = | **Difference** |
| | Copy lines 35-37 from the previous month's report. | | Copy lines 20-22 of this report. | | Subtract Column B from Column A. |
| 32. **Cash receipts** | $ 300,000.00 | — | $ 504,792.88 | = | $ -204,792.88 |
| 33. **Cash disbursements** | $ 240,000.00 | — | $ 291,843.81 | = | $ -51,843.81 |
| 34. **Net cash flow** | $ 110,000.00 | — | $ 212,949.07 | = | $ -152,949.07 |

35. Total projected cash receipts for the next month:                                   $  75,000.00
36. Total projected cash disbursements for the next month:                            - $  200,000.00
37. Total projected net cash flow for the next month:                                 = $  -125,000.00

---

Debtor Name  Idaho Health Data Exchange                          Case number 22-00355-JMM

## 8. Additional Information

If available, check the box to the left and attach copies of the following documents.

☑ 38.  Bank statements for each open account (redact all but the last 4 digits of account numbers).

☐ 39.  Bank reconciliation reports for each account.

☑ 40.  Financial reports such as an income statement (profit & loss) and/or balance sheet.

☐ 41.  Budget, projection, or forecast reports.

☐ 42.  Project, job costing, or work-in-progress reports.

**Fill in this information to identify the case:**

Debtor Name __Idaho Health Data Exchange__

United States Bankruptcy Court for the: __District of Idaho__

Case number: __22-00355-JMM__

☐ Check if this is an
amended filing

---

## Official Form 425C

---

# Monthly Operating Report for Small Business Under Chapter 11    12/17

Month: __February 2023__      Date report filed: __03/21/2023__
                                                                 MM / DD / YYYY

Line of business: __Data Processing__      NAISC code: __518210__

In accordance with title 28, section 1746, of the United States Code, I declare under penalty of perjury
that I have examined the following small business monthly operating report and the accompanying
attachments and, to the best of my knowledge, these documents are true, correct, and complete.

Responsible party:      __Jesse Meldru__

Original signature of responsible party

Printed name of responsible party      __Jesse Meldru__

---

## 1. Questionnaire

Answer all questions on behalf of the debtor for the period covered by this report, unless otherwise indicated.

|  |  | Yes | No | N/A |
|---|---|:---:|:---:|:---:|
| | **If you answer _No_ to any of the questions in lines 1-9, attach an explanation and label it _Exhibit A._** | | | |
| 1. | Did the business operate during the entire reporting period? | ☑ | ☐ | ☐ |
| 2. | Do you plan to continue to operate the business next month? | ☑ | ☐ | ☐ |
| 3. | Have you paid all of your bills on time? | ☑ | ☐ | ☐ |
| 4. | Did you pay your employees on time? | ☑ | ☐ | ☐ |
| 5. | Have you deposited all the receipts for your business into debtor in possession (DIP) accounts? | ☐ | ☑ | ☐ |
| 6. | Have you timely filed your tax returns and paid all of your taxes? | ☑ | ☐ | ☐ |
| 7. | Have you timely filed all other required government filings? | ☑ | ☐ | ☐ |
| 8. | Are you current on your quarterly fee payments to the U.S. Trustee or Bankruptcy Administrator? | ☑ | ☐ | ☐ |
| 9. | Have you timely paid all of your insurance premiums? | ☑ | ☐ | ☐ |
| | **If you answer _Yes_ to any of the questions in lines 10-18, attach an explanation and label it _Exhibit B._** | | | |
| 10. | Do you have any bank accounts open other than the DIP accounts? | ☑ | ☐ | ☐ |
| 11. | Have you sold any assets other than inventory? | ☐ | ☑ | ☐ |
| 12. | Have you sold or transferred any assets or provided services to anyone related to the DIP in any way? | ☐ | ☑ | ☐ |
| 13. | Did any insurance company cancel your policy? | ☐ | ☑ | ☐ |
| 14. | Did you have any unusual or significant unanticipated expenses? | ☐ | ☑ | ☐ |
| 15. | Have you borrowed money from anyone or has anyone made any payments on your behalf? | ☐ | ☑ | ☐ |
| 16. | Has anyone made an investment in your business? | ☐ | ☑ | ☐ |

Debtor Name  Idaho Health Data Exchange                     Case number  22-00355-JMM

| | | | |
|---|---|---|---|
| 17.  Have you paid any bills you owed before you filed bankruptcy? | ☐ | ☑ | ☐ |
| 18.  Have you allowed any checks to clear the bank that were issued before you filed bankruptcy? | ☐ | ☑ | ☐ |

---

## ■ 2. Summary of Cash Activity for All Accounts

**19.  Total opening balance of all accounts**

This amount must equal what you reported as the cash on hand at the end of the month in the previous month. If this is your first report, report the total cash on hand as of the date of the filing of this case.

$ 274,670.96

**20.  Total cash receipts**

Attach a listing of all cash received for the month and label it *Exhibit C*. Include all cash received even if you have not deposited it at the bank, collections on receivables, credit card deposits, cash received from other parties, or loans, gifts, or payments made by other parties on your behalf. Do not attach bank statements in lieu of *Exhibit C*.

Report the total from *Exhibit C* here.

$ 504,792.88

**21.  Total cash disbursements**

Attach a listing of all payments you made in the month and label it *Exhibit D*. List the date paid, payee, purpose, and amount. Include all cash payments, debit card transactions, checks issued even if they have not cleared the bank, outstanding checks issued before the bankruptcy was filed that were allowed to clear this month, and payments made by other parties on your behalf. Do not attach bank statements in lieu of *Exhibit D*.

Report the total from *Exhibit D* here.

– $ 291,843.81

**22.  Net cash flow**

Subtract line 21 from line 20 and report the result here.
This amount may be different from what you may have calculated as *net profit*.

+ $ 212,949.07

**23.  Cash on hand at the end of the month**

Add line 22 + line 19. Report the result here.

Report this figure as the *cash on hand at the beginning of the month* on your next operating report.

This amount may not match your bank account balance because you may have outstanding checks that have not cleared the bank or deposits in transit.

= $ 487,620.03

---

## ■ 3. Unpaid Bills

Attach a list of all debts (including taxes) which you have incurred since the date you filed bankruptcy but have not paid. Label it *Exhibit E*. Include the date the debt was incurred, who is owed the money, the purpose of the debt, and when the debt is due. Report the total from *Exhibit E* here.

**24.  Total payables**

*(Exhibit E)*

$ 70,333.39

---

Debtor Name **Idaho Health Data Exchange**          Case number **22-00355-JMM**

---

### 4. Money Owed to You

Attach a list of all amounts owed to you by your customers for work you have done or merchandise you have sold. Include amounts owed to you both before, and after you filed bankruptcy.  Label it *Exhibit F*. Identify who owes you money, how much is owed, and when payment is due. Report the total from *Exhibit F* here.

25. **Total receivables**                                                   $ 218,639.25

   *(Exhibit F)*

---

### 5. Employees

26. What was the number of employees when the case was filed?                    2

27. What is the number of employees as of the date of this monthly report?       2

---

### 6. Professional Fees

28. How much have you paid this month in professional fees related to this bankruptcy case?        $ 0.00

29. How much have you paid in professional fees related to this bankruptcy case since the case was filed?    $ 0.00

30. How much have you paid this month in other professional fees?                                  $ 0.00

31. How much have you paid in total other professional fees since filing the case?                $ 0.00

---

### 7. Projections

Compare your actual cash receipts and disbursements to what you projected in the previous month.
Projected figures in the first month should match those provided at the initial debtor interview, if any.

| | *Column A*<br>**Projected** | — | *Column B*<br>**Actual** | = | *Column C*<br>**Difference** |
|---|---|---|---|---|---|
| | Copy lines 35-37 from the previous month's report. | | Copy lines 20-22 of this report. | | Subtract Column B from Column A. |
| 32. **Cash receipts** | $ 300,000.00 | — | $ 504,792.88 | = | $ -204,792.88 |
| 33. **Cash disbursements** | $ 240,000.00 | — | $ 291,843.81 | = | $ -51,843.81 |
| 34. **Net cash flow** | $ 110,000.00 | — | $ 212,949.07 | = | $ -152,949.07 |

35. Total projected cash receipts for the next month:                    $ 75,000.00

36. Total projected cash disbursements for the next month:             - $ 200,000.00

37. Total projected net cash flow for the next month:                   = $ -125,000.00

---

Official Form 425C          **Monthly Operating Report for Small Business Under Chapter 11**          page **3**

Debtor Name  Idaho Health Data Exchange                    Case number 22-00355-JMM

---

### ▮ 8. Additional Information

If available, check the box to the left and attach copies of the following documents.

☑ 38. Bank statements for each open account (redact all but the last 4 digits of account numbers).

☐ 39. Bank reconciliation reports for each account.

☑ 40. Financial reports such as an income statement (profit & loss) and/or balance sheet.

☐ 41. Budget, projection, or forecast reports.

☐ 42. Project, job costing, or work-in-progress reports.

Official Form 425C          **Monthly Operating Report for Small Business Under Chapter 11**          page **4**

## EXHIBIT A/B

### February 2023 Monthly Operating Report

**EXHIBIT A:**

#5 – Most of the cash has been moved to the DIP account. Debtor had left approximately $50K in the old account for the month of December to ensure funds were available to cover any payments that were not already redirected to the new account. At the end of January, this amount now totals just under $1,000.

**EXHIBIT B:**

#10 – Please see answer to #5 above.

# EXHIBIT B
(IHDE/CI Settlement Agreement)

## SETTLEMENT AND RELEASE AGREEMENT

THIS SETTLEMENT AND RELEASE AGREEMENT (this "Agreement") is made and entered into as of the _29 day of March, 2023, by and between **IDAHO HEALTH DATA EXCHANGE, INC.,** an Idaho nonprofit corporation ("IHDE" or the "Debtor"), and **CUREOUS INNOVATIONS, INC.,** a Delaware corporation ("CI"). IHDE and CI are collectively referred to herein as the "Parties" and individually as a "Party".

## RECITALS

A.  **WHEREAS,** IHDE is a state designated internet-based health information exchange designed to provide statewide coordination of health care in Idaho. IHDE previously filed a Chapter 11 bankruptcy petition in the U.S. Bankruptcy Court for the District of Idaho (the "Bankruptcy Court"), Case No. 22-00355-JMM (the "Bankruptcy Case"); and

B.  **WHEREAS,** CI is a healthcare technology and data company that licenses and provided subscriptions for interoperability software, and previously contracted with IHDE to provide software solutions; and

C.  **WHEREAS,** prior to the filing of the Bankruptcy Case, CI filed a complaint against IHDE in Ada County Case No. CV01-21-15209 (the "Ada County Case"). In the Ada County Case, CI obtained a pre-judgment writ of attachment which directed the Ada County Sheriff to seize funds from IHDE's bank account; and

D.  **WHEREAS,** pursuant to the writ of attachment, the Ada County Sheriff seized $469,767.83 in funds from IHDE's bank account, which the Ada County Sheriff continues to hold pending further court order (the "Seized Funds"); and

E.  **WHEREAS,** IHDE filed an adversary proceeding in the Bankruptcy Court seeking to recover the Seized Funds pursuant to 11 U.S.C. §547 – Adversary Case No. 22-06018-JMM (the "Adversary Case"). In the Adversary Case, IHDE also objected to CI's claim in the Bankruptcy Case; and

F.  **WHEREAS,** CI responded to the Adversary Case and disputes IHDE's avoidance claim and objection to CI's claim; and

G.  **NOW,** the Parties desire to settle and resolve all of the issues between them outlined in the Ada County Case, the Bankruptcy Case, the Adversary Case or otherwise pertaining to the relationship of the Parties on or before the date of this Agreement (the "Dispute") on the terms set forth below.

## AGREEMENTS AND RELEASES

**NOW, THEREFORE**, in consideration of the mutual promises, terms, obligations and undertakings set forth herein, and other good and valuable consideration, the sufficiency and adequacy of which are hereby acknowledged, the Parties agree as follows:

1. Specific terms of Agreement:

   a. The Seized Funds shall be split between the Parties, with CI receiving $235,000.00 and IHDE receiving the balance of $234,767.83.

   b. Upon Bankruptcy Court approval of this compromise (as contemplated below), the Parties agree to submit the Stipulation and Order attached here as Exhibit 1 (which includes a proposed order) to the Ada County court in the Ada County Case directing the Ada County Sheriff to release the funds as set forth above.

   c. Upon the Sheriff's release of the funds as set forth above:

      i. the Parties agree to jointly seek dismissal of the Ada County Case with prejudice, with each Party bearing its own costs and attorney fees related to that case;

      ii. CI agrees to withdraw its Proof of Claim filed in the Bankruptcy Case and not pursue any further claims against IHDE or its officers, directors, employees or other representatives with respect to the Dispute, including voting on or objecting to any Chapter 11 plan proposed by IHDE; and

      iii. the Parties agree to jointly seek dismissal of the Adversary Case, with each Party bearing its own costs and attorney fees related to that case.

   d. As soon as practicable following execution of this Agreement by the Parties, CI will identify to IHDE those documents and/or statements on IHDE's website and in IHDE's Chapter 11 plan that CI considers inaccurate or offensive to CI (the "Offensive Material") and will propose specific changes to the language in the Chapter 11 plan to make statements relating to the Dispute purely factual in nature and neutral in tone (the "Plan Revisions"). Promptly following Bankruptcy Court approval of this compromise, IHDE will remove the Offensive Material from its website, will incorporate the Plan Revisions into its amended Chapter 11 Plan, and will not publish any disparaging statements relating to CI.

2. Mutual Releases: Contingent only upon Bankruptcy Court approval of this compromise and the release of funds by the Ada County Sheriff, each Party for itself, and for its members, managers, employees, agents, affiliates, subsidiaries, successors, and assigns, does hereby release, waive and forever discharge, and covenant not to sue the opposing Party together

with its members, managers, affiliates, family members, successors, assigns and transferees and all of their agents, partners, current or former advisors, current or former attorneys, current or former members and employees, and current and former managers, with respect to each and every claim, counterclaims, remedies, liabilities, debts, demands, costs, expenses, and attorneys' fees, of any kind or nature whatsoever, disputed or undisputed, liquidated or unliquidated, known or unknown, express or implied, legal or equitable, arising out of or relating to the Dispute and otherwise pertaining to the relationship of the Parties on or before the date of this Agreement.

3.    Contingent. The Parties agree that the terms of this Agreement are contingent upon Bankruptcy Court approval pursuant to Fed. R. Bankr. Proc. 9019. As soon as possible after this Agreement is executed, IHDE agrees to file a motion in the Bankruptcy Case, in form and substance reasonable acceptable to CI and its counsel, seeking Bankruptcy Court approval of the compromise reflected by this Agreement.

4.    Recitals Incorporated by Reference. The Parties incorporate into this Agreement, as part of the terms of this Agreement, the "Recitals" set forth above.

5.    Representations and Warranties. The Parties each warrant that they have agreed to enter into this Agreement knowingly and voluntarily and not in reliance upon any promise, inducement, or agreement, other than that which is specified herein. The Parties further warrant that they have full authority to enter into the terms of the compromise, pursuant to any governing documents (if any) of the Parties.

6.    Cause of Action for Breach. If either Party breaches this Agreement, the other Party shall have a cause of action for the breach. In such an action, the prevailing Party shall be entitled to recover from the breaching Party, in addition to any other relief provided by law or equity, such costs and expenses (including reasonable attorney's fees) as may be incurred by the prevailing Party in enforcing or otherwise applying the terms of this Agreement. Any action under this paragraph shall not in any way invalidate or nullify the settlement or any other terms of this Agreement.

7.    Entire Agreement. This Agreement contains the entire understanding between the Parties and supersedes all pre-existing or contemporaneous agreements or understandings, oral or written, respecting the subject matter hereof. Further, the Parties agree that this Agreement was negotiated by the Parties, and therefore shall not be interpreted against any one Party as the drafter of the Agreement.

8.    No Oral Modifications. This Agreement may be modified in whole or in part only by an agreement in writing executed by the Parties or their counsel.

9.    Independent Legal Advice. Each of the Parties have received or declined to receive independent legal advice from legal counsel of their choice with respect to the advisability of making the settlement and release provided for herein and with respect to the advisability of executing this Agreement.

10.    Severability. The Parties acknowledge that the purpose of this Agreement is to settle disputes and release claims, and in the event for any reason that any provision or portion of

this Agreement shall be found to be void or invalid, the Parties will continue to interpret this Agreement to accomplish the stated purpose.

11.     Investigation. Each of the Parties has read the Agreement carefully, knows and understands the contents thereof, and has made such investigation of the facts pertaining to the settlement and this Agreement and of all matters pertaining hereto, or impacted hereby, as it deems necessary or desirable. Neither Party has relied upon any statement, representation, or promise of the other Party, or of any representative or attorney for the other Party, in executing this Agreement or in making the settlement provided for herein.

12.     Governing Law. This Agreement shall be governed and construed in accordance with the laws of the State of Idaho in all respects, including matters of construction, enforcement and performance, without regard to principles of conflicts of laws. The Parties agree that the venue of any action to enforce this Agreement shall be in the Bankruptcy Court, so long as the Bankruptcy Case is pending, following which it shall be in the courts located in Ada County, Idaho.

13.     Counterparts. This Agreement may be executed in two or more counterparts, transmitted by facsimile, pdf or otherwise, each of which shall be deemed an original, and both of which together shall constitute a single instrument.

14.     Waiver. Failure of a Party to exercise a right upon default of the other Party shall not be construed as a waiver of a right to insist upon full performance of all the terms and conditions of this Agreement.

IN WITNESS WHEREOF the Parties have caused this Agreement to be executed the day and year first above written.

_____
**IDAHO HEALTH DATA EXCHANGE, INC.**
By: Jesse Meldru, Director of Finance

_____
**CUREOUS INNOVATIONS, INC.**
By: _____

Its: _____

this Agreement shall be found to be void or invalid, the Parties will continue to interpret this Agreement to accomplish the stated purpose.

11. <u>Investigation</u>. Each of the Parties has read the Agreement carefully, knows and understands the contents thereof, and has made such investigation of the facts pertaining to the settlement and this Agreement and of all matters pertaining hereto, or impacted hereby, as it deems necessary or desirable. Neither Party has relied upon any statement, representation, or promise of the other Party, or of any representative or attorney for the other Party, in executing this Agreement or in making the settlement provided for herein.

12. <u>Governing Law</u>. This Agreement shall be governed and construed in accordance with the laws of the State of Idaho in all respects, including matters of construction, enforcement and performance, without regard to principles of conflicts of laws. The Parties agree that the venue of any action to enforce this Agreement shall be in the Bankruptcy Court, so long as the Bankruptcy Case is pending, following which it shall be in the courts located in Ada County, Idaho.

13. <u>Counterparts</u>. This Agreement may be executed in two or more counterparts, transmitted by facsimile, pdf or otherwise, each of which shall be deemed an original, and both of which together shall constitute a single instrument.

14. <u>Waiver</u>. Failure of a Party to exercise a right upon default of the other Party shall not be construed as a waiver of a right to insist upon full performance of all the terms and conditions of this Agreement.

IN WITNESS WHEREOF the Parties have caused this Agreement to be executed the day and year first above written.

_____
**IDAHO HEALTH DATA EXCHANGE, INC.**
By: Jesse Meldru, Director of Finance

_____
**CUREOUS INNOVATIONS, INC.**
By: Shaun T. Alfreds

Its: President and CEO

**Exhibit 1**

IN THE DISTRICT COURT OF THE FOURTH JUDICIAL DISTRICT OF
THE STATE OF IDAHO, IN AND FOR THE COUNTY OF ADA

| | |
|---|---|
| CUREOUS INNOVATIONS, INC., a Delaware corporation, | Case No. CV01-21-15209 |
| Plaintiff, | STIPULATION FOR RELEASE OF SEIZED FUNDS |
| vs. | |
| IDAHO HEALTH DATA EXCHANGE, INC, an Idaho corporation, | |
| Defendant | |

The parties to this proceeding, CUREOUS INNOVATIONS, INC. ("Cureous"), and
IDAHO HEALTH DATA EXCHANGE, INC. ("IHDE"), by and through their respective counsel
of record, stipulate and agree as follows:

1.     This Court previously entered a prejudgment Writ of Attachment, dated May 19,
2022. After that date, and pursuant to that Writ, the Ada County Sheriff seized $469,767.83 from
IHDE's bank account at DL Evans bank, which account the bank subsequently closed. The Ada
County Sheriff continues to hold the seized funds.

2.     On August 12, 2022, IHDE filed a Chapter 11 bankruptcy petition in the United
States Bankruptcy Court for the District of Idaho, thereby staying this case.

3.     Based on an Agreement between the parties, which agreement has been approved
by the Bankruptcy Court in IHDE's bankruptcy case, the parties agree that the funds should be
released to the parties, with Cureous receiving $235,000.00 of the seized funds, and IHDE

receiving $234,767.83 of the seized funds.  The parties stipulate to entry of an order by this Court in the form attached here as *Exhibit A.*

      4.      Upon the release of funds by the Ada County Sheriff, the parties agree to seek dismissal of this case with prejudice and with each party paying its own attorney fees and costs.

DATED this ___ day of _____, 2023.

_____
NICOLE C. HANCOCK
Attorney for Cureous Innovations, Inc.

DATED this ___ day of _____, 2023.

_____
MELODIE A. MCQUADE
Attorney for Idaho Health Data Exchange, Inc.

# EXHIBIT A

IN THE DISTRICT COURT OF THE FOURTH JUDICIAL DISTRICT OF
THE STATE OF IDAHO, IN AND FOR THE COUNTY OF ADA

| | |
|---|---|
| CUREOUS INNOVATIONS, INC., a Delaware corporation,<br><br>                    Plaintiff,<br><br>vs.<br><br>IDAHO HEALTH DATA EXCHANGE, INC, an Idaho corporation,<br><br>                    Defendant | Case No. CV01-21-15209<br><br>**ORDER FOR RELEASE OF SEIZED FUNDS** |

Having reviewed the Stipulation for Release of Seized Funds filed by the parties, and for good cause,

IT IS HEREBY ORDERED that the pre-judgment Writ of Attachment previously entered in this case, dated May 19, 2022, is DISCHARGED and any funds seized by the Ada County Sheriff pursuant to such Writ, shall be IMMEDIATELY RELEASED as follows:  The Ada County Sheriff shall pay $235,000.00 of the seized funds to Cureous Innovations, Inc., and the balance of $234,767.83 to Idaho Health Data Exchange, Inc.

DATED this _____ day of _____, 2023.


_____
CYNTHIA YEE-WALLACE
District Judge
Fourth Judicial District

# EXHIBIT C

(List of Executory Contracts)

**<u>List of Executory Contracts to Be Assumed:</u>**

1.  Contract with Orion Health, Inc.
2.  Office lease agreement
3.  All provider/subscriber contracts on the attached list

# EXHIBIT D

(Financial Projections)



**IHDE Sustainability Projections 2022-2027**

**Current IHDE Business Operations – 2023 – Total Projected Billings of $2.4MM**

- **Current Revenue Model:** IHDE's revenue model to date has been supported by participant fees generated based on # of participants and # of hospital beds for clients connected to the health information exchange infrastructure through either interfaces or a record view portal.

  o **Addition of New Clients:** IHDE added 25 new billable clients in 2022 for an additional $77K of billings and expects to continue that trend of the addition of incremental clients. While IHDE expects to continue to add clients in 2023-2027, this projection of cash collections does not currently quantify those expectations in terms of either new clients or cash collections from contracts with those new clients.

  o **Increase of Fee Levels**: IHDE increased fees resulting in incremental billings of $148K in 2022 and expects to increase fees further by an average of 7.5% for most of IHDE's existing clients in 2023. In aggregate, IHDE's forecasted fee increases are expected to result in additional billing and collections of $358K in 2023. IHDE currently expects to continue to increase fees further by an average of 4% in 2024 and 3.5% in 2025 and continue at 3% annual fee increases thereafter.



- **Current Cash Disbursement for Company Operations:** IHDE's total cash disbursement for company operations in 2022 totaled to $4.3MM, where 58% of the cash disbursement was related to staffing, consulting, and G&A costs and the 42% of cash



disbursement was related to information technology infrastructure and related vendor costs.

- o **Projected Disbursements:** IHDE's total cash disbursement for company operations in 2023 is projected to be $2.4MM, where 43% of the forecasted cash disbursement is related to staffing, consulting, and G&A costs while 43% of forecasted cash disbursement is related to information technology infrastructure and related vendor costs.  Total forecasted cash disbursement levels for IHDE are expected to remain in a range of $2.5MM to $2.7MM for 2024 and 2027 of the proposed plan period.  Throughout the proposed plan period, creditor repayments are forecasted to average annually 11.3% of IHDE's total cash disbursements.





### 2022 thru 2027 Full Year - CASH Impacts

| | 2022-FY | 2023-FY | 2024-FY | 2025-FY | 2026-FY | 2027-FY |
|---|---|---|---|---|---|---|
| IHDE Client Service Collections | 1,877,955 | 2,501,674 | 2,497,763 | 2,619,092 | 2,670,188 | 2,738,897 |
| IHDE Cash Collection (Other) | 1,881,030 | 0 | 0 | 0 | 0 | 0 |
| IDHW Service Contract Collections | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total Cash Inflows** | **3,758,984** | **2,501,674** | **2,497,763** | **2,619,092** | **2,670,188** | **2,738,897** |

| Annual Cash Outflows | 2022-FY | 2023-FY | 2024-FY | 2025-FY | 2026-FY | 2027-FY |
|---|---|---|---|---|---|---|
| ⊟ Employee | (532,243) | (357,874) | (342,381) | (342,380) | (342,380) | (342,380) |
| ⊟ Vendor | (2,042,568) | (1,842,451) | (1,779,525) | (1,779,525) | (1,779,525) | (1,787,525) |
| Accounting Support | (1,838) | (13,687) | (13,500) | (13,500) | (13,500) | (13,500) |
| Insurance | (73,900) | (73,900) | (73,900) | (73,900) | (73,900) | (73,900) |
| IT Infrastructure Support | (182,087) | (123,010) | (105,000) | (105,000) | (105,000) | (105,000) |
| Legal Support | (138,116) | (7,292) | (17,500) | (17,500) | (17,500) | (17,500) |
| Office Equipment Lease | 0 | 0 | 0 | 0 | 0 | 0 |
| Office Supplies | 0 | 0 | 0 | 0 | 0 | 0 |
| Payroll Services | (3,025) | 0 | 0 | 0 | 0 | 0 |
| Professional Services | (99,385) | (68,000) | (68,000) | (68,000) | (68,000) | (76,000) |
| Rent | (5,609) | (13,612) | (15,000) | (15,000) | (15,000) | (15,000) |
| Technology Services Support | (149,298) | (425,600) | (450,000) | (450,000) | (450,000) | (450,000) |
| Technology Stack | (1,380,099) | (1,114,515) | (1,035,000) | (1,035,000) | (1,035,000) | (1,035,000) |
| Vendor Payments | 0 | 0 | 0 | 0 | 0 | 0 |
| Banking & CC | (8,653) | (1,213) | 0 | 0 | 0 | 0 |
| Banking | (557) | (1,623) | (1,625) | (1,625) | (1,625) | (1,625) |
| ⊟ Management | (1,193,751) | (286,374) | (210,000) | (210,000) | (210,000) | (210,000) |
| Contracted Services | (1,193,751) | (286,374) | (210,000) | (210,000) | (210,000) | (210,000) |
| ⊟ Miscellaneous | 0 | 0 | 0 | 0 | 0 | 0 |
| ⊟ Creditors | 0 | (389,000) | (264,000) | (284,000) | (288,000) | (288,000) |
| Creditor Payments-1 | 0 | (126,000) | (216,000) | (236,000) | (240,000) | (240,000) |
| Creditor Payments-2 | 0 | (235,000) | 0 | 0 | 0 | 0 |
| Creditor Payments-3 | 0 | (28,000) | (48,000) | (48,000) | (48,000) | (48,000) |
| ⊟ CI Cash Siezure | (469,768) | 469,768 | 0 | 0 | 0 | 0 |
| CI Cash Siezure | (469,768) | 469,768 | 0 | 0 | 0 | 0 |
| **Total Cash Outflows** | **(4,238,330)** | **(2,405,932)** | **(2,595,906)** | **(2,615,905)** | **(2,619,905)** | **(2,627,905)** |

| | 2022-FY | 2023-FY | 2024-FY | 2025-FY | 2026-FY | 2027-FY |
|---|---|---|---|---|---|---|
| **Net Cash Impact** | **(479,345)** | **95,743** | **(98,143)** | **3,187** | **50,283** | **110,991** |
| 5 Year Net Cash Accumulation: | | | 162,061 | | | |

| % of Total Expenses | 2022-FY | 2023-FY | 2024-FY | 2025-FY | 2026-FY | 2027-FY |
|---|---|---|---|---|---|---|
| Personnel & Management | 49.8% | 37.2% | 38.6% | 38.3% | 38.3% | 38.1% |
| General & Administrative | 8.8% | 6.2% | 7.3% | 7.2% | 7.2% | 7.5% |
| IT Infrastructure | 41.5% | 43.0% | 43.9% | 43.6% | 43.5% | 43.4% |
| Creditor Repayment | 0.0% | 13.5% | 10.2% | 10.9% | 11.0% | 11.0% |

- o **Cash Surplus (Deficit):** IHDE is expected to generate a cash surplus in 2023 with the return of the $235K, which will ensure cash availability through 2024 while IHDE continues to work to increase fees and add new clients. IHDE forecasts it will accumulate a cash deficit in 2024 and a small cash surplus in 2025, however the weekly cash balances average to $425K over the proposed plan period with annual nadirs in the midpoint of the year that precedes collection of a large set of IHDE's annual contracted fees. Efforts are underway to change some of those annual contracted fee invoice and collection schedules to quarterly schedules in order to smooth out the cash cycle. Regardless, IHDE's forecasted cash receipts and disbursements produce a favorable trend of incremental positive cash accumulation throughout the plan period that ensures cash availability throughout the plan period.

- o The chart below demonstrates IHDE's dependency on a cash surplus to operate through the fluctuations in the timing of collections on projected invoices for IHDE's larger clients. As discussed earlier, IHDE has not forecasted cash collections from new client additions in this forecast but expects to continue to add new clients throughout the proposed plan period. IHDE expects that cash collection for fees associated with these new clients should incrementally help to



buffer the low points in IHDE's projected cash balances and further insulate
IHDE's liquidity.



# EXHIBIT E

(Stipulation Regarding Plan Treatment of Orion Health, Inc.)

Sheila R. Schwager, ISB No. 5059
HAWLEY TROXELL ENNIS & HAWLEY LLP
877 Main Street, Suite 200
P.O. Box 1617
Boise, ID 83701-1617
Telephone:  208.344.6000
Facsimile:  208.954.5261
Email: sschwager@hawleytroxell.com

Attorney for Creditor Orion Health Inc.

UNITED STATES BANKRUPTCY COURT

DISTRICT OF IDAHO

|  |  |
|---|---|
| In Re:<br><br>IDAHO HEALTH DATA EXCHANGE, INC.,<br><br>　　　　　Debtor | Case No. 22-00355-JMM<br><br>Chapter 11, Subchapter V |

## <u>STIPULATION REGARDING PLAN TREATMENT OF ORION HEALTH, INC.</u>

　　　Creditor Orion Health, Inc., ("**Orion Health**") by and through its attorneys of record

Hawley Troxell Ennis & Hawley LLP; the Debtor Idaho Health Data Exchange, Inc.,

("**Debtor**"), by and through its attorneys of record Johnson May; and the SubChapter V Trustee

("**Trustee**"), hereby stipulate to the modification of the terms of the plan treatment of Orion

Health as set forth in the SubChapter V Debtor' Plan of Reorganization, Dkt. No. 31 ("**Plan**"),

based upon the following terms and grounds:

STIPULATION REGARDING PLAN TREATMENT OF ORION HEALTH, INC. - 1

1.      In the Plan, the Debtor proposes to assume the executory contract entered into
with Orion Health ("**Orion Contract**"), but instead of curing the default and paying the
obligation under the executory contract in accordance with the terms, as set forth in 11 U.S.C. §
365, the Debtor proposes to pay $2,281,100.43[1], plus accrued and accruing interest, and attorney
fees and costs ("**Obligation**") over a period of time.  Under the terms of the Orion Contract, the
Obligation was to be paid at $46,112.33 per month, at an interest rate of 7% per annum, with all
remaining amounts due and owing on March 1, 2027.  The Debtor has represented to Orion
Health that it is necessary to pay the Obligation over a longer period of time at a reduced
monthly amount, as the Debtor will not have sufficient cash flow to operate and pay the
Obligation pursuant to the terms of the Orion Contract.  The Debtor has informed Orion Health
that if an acceptable workout agreement is not reached between the Parties, and Orion Health
insists on a complete cure of the executory contract default, then the Debtor will not be able to
continue with its operations.

2.      The Plan initially proposes to pay Orion Health's Obligation at five percent (5%)
per annum, over one hundred twenty (120) months (ten years), at $15,000 per month, with a
balloon payment then due and owing in full.

---

[1] As set forth in the Proof of Claim filed by Orion Health dated October 20, 2022.  Such amount
has additional interest, attorney fees, and costs that have accrued since October 20, 2022. To
the extent any payments have been made by the Debtor to the amounts set forth in the Proof
of Claim, the Obligation will be reduced accordingly.

STIPULATION REGARDING PLAN TREATMENT OF ORION HEALTH,
INC. - 2

3.     The Debtor and Orion Health have reached an agreement to pay Orion Health's Obligation as follows:

  a.  Attorney fees and costs incurred by Orion Health shall be added to the principal of the outstanding Obligation;

  b.  Principal shall accrue interest at five percent (5%) per annum;

  c.  There shall be no pre-payment penalty;

  d.  Upon the confirmation of the Plan, the Debtor shall make monthly payments of Eighteen Thousand Dollars ($18,000) paid on the 1st day of each month, for the first twenty-four months (years 1-2);

  e.  Commencing the 1st day of the twenty-fifth month following the confirmation of the Plan, the Debtor shall increase the monthly payment to Twenty Thousand Dollars ($20,000), for the next thirty-six months (years 3-5);

  f.  Commencing on the 1st day of the sixty-first month following confirmation of the Plan, the monthly payments shall be increased to Twenty-five Thousand Dollars ($25,000), for the next twenty-three months (years 6-7); and

  g.  All remaining principal, interest, and fees are due no later than the 1st day of the eighty-fourth month following confirmation of the Plan.

4.     The Parties agree to expedite the move of all of the operations to a single electronic platform and to use best efforts and endeavors to have the move completed by May 1, 2023.

5.     The Debtor shall continue to pay the Saas Fee of $60,000, as it becomes due under the terms of the existing Orion Contract.

STIPULATION REGARDING PLAN TREATMENT OF ORION HEALTH, INC. - 3

6.      The Debtor shall be current on all SaaS Fees due under the Orion Contract as of January 30, 2023, and will remain current thereafter.

7.      All fees for  additional professional services as set forth in a Statement of Work or Change Request ("**PCN(s)**") shall continue to be paid in accordance with the terms of the Orion Contract, unless Orion Health otherwise agrees in a signed writing.

8.      There shall be no grace periods for payments owed to Orion Health under the Orion Contract, as modified by the terms herein, but the Debtor shall have the Cure Period as set forth below.

9.      So long as the automatic stay is applicable to the Debtor, the Debtor hereby agrees that if the Debtor fails to remit any of the payments required under the terms of the Orion Contract, as modified by the terms herein, or to otherwise comply with the Plan terms, as modified herein, then Orion Health is entitled to immediately stay any obligation to affirmatively provide additional services as set forth in an existing, new, or requested PCN, and if the Debtor does not cure the default within fourteen (14) days after written notice is mailed and emailed to Debtor ("**Cure Period**"), then the Debtor hereby agrees that upon Orion Health filing an affidavit with the above-captioned U.S. Bankruptcy Court representing that the default has not been cured, and subject to the Court determining otherwise, Orion Health is entitled to an order terminating the automatic stay pursuant to 11 U.S.C. § 362, as against Orion Health and as against the Orion Contract. The Debtor agrees the order shall entitle Orion Health to terminate the Orion Contract, without further judicial proceedings.  This agreement is intended to survive the closing, dismissal, or conversion of the bankruptcy case.

STIPULATION REGARDING PLAN TREATMENT OF ORION HEALTH, INC. - 4

10.    Orion Health will, concurrently herewith, return a ballot voting in favor of the

Plan, with the intent that it is agreeing to the Plan terms, as modified herein.

Wherefore the Parties hereto stipulate that the Debtor's proposed Plan is hereby modified

to incorporate the terms set forth herein.

DATED THIS 25th day of January, 2023.

HAWLEY TROXELL ENNIS & HAWLEY LLP

By _____
Sheila R. Schwager, ISB No. ISB No. 5059
Attorney for Creditor Orion Health Inc.

DATED THIS 25th day of
January, 2023.

JOHNSON MAY

By  /s/ Matthew T. Christensen, *authorized via
email dated 1.25.23*
    Matthew T. Christensen, ISB No. 7213
Attorney for Debtor, Idaho Health Data Exchange,
Inc.

DATED THIS 25th day of January,

2023.                                SUB-CHAPTER V TRUSTEE

By   /s/ Matthew W. Grimshaw, *authorized via
email dated 1.25.23*
    Matthew W. Grimshaw

STIPULATION REGARDING PLAN TREATMENT OF ORION HEALTH,
INC. - 5

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 25th day of January, 2023, I electronically filed the foregoing STIPULATION REGARDING PLAN TREATMENT OF ORION HEALTH, INC., with the Clerk of the Court using the CM/ECF system which sent a Notice of Electronic Filing to those identified in the CM/ECF system for this matter, at the time this document was filed, including the following persons:

| | |
|---|---|
| Jason Ronald Naess | Jason.r.naess@usdoj.gov |
| U.S. Trustee | Ustp.region18.bs.ecf@usdoj.gov |
| Matthew Todd Christensen | mtc@johnsonmaylaw.com |
| Matthew W. Grimshaw | matt@grimshawlawgroup.com |
| Nicole C. Hancock | Nicole.hancock@stoel.com |
| J.B. Evans | Jb.evans@stoel.com |
| Jaclyn T. Gans | jtg@elamburke.com |

Sheila R. Schwager

STIPULATION REGARDING PLAN TREATMENT OF ORION HEALTH, INC. - 6

60435.0001.15415828.1

# EXHIBIT F

(Liquidation Analysis)

Idaho Health Data Exchange HYPOTHETICAL LIQUIDATION ANALYSIS (Chapter 7 w/o Cureous Settlement)

| REAL PROPERTY | FMV | 1ST DOT | 2ND DOT | OTHER LIENS | EXEMPTIONS | NON-EXEMPT EQUITY | LIQUIDATION VALUE TO CH. 7 ESTATE | Notes |
|---|---|---|---|---|---|---|---|---|
| None | $0.00 | | | | $0.00 | $0.00 | $0.00 | |

| OTHER REAL PROPERTY | FMV | 1ST DOT | 2ND DOT | | EXEMPTIONS | NON-EXEMPT EQUITY | | |
|---|---|---|---|---|---|---|---|---|
| None | $0.00 | | | | $0.00 | $0.00 | $0.00 | |

| BUSINESSES | VALUE OF DEBTOR'S INTEREST | | | | EXEMPTIONS | NON-EXEMPT VALUE | | |
|---|---|---|---|---|---|---|---|---|
| None | $0.00 | | | | $0.00 | $0.00 | $0.00 | |

| PERSONAL PROPERTY | FMV | | | | EXEMPTIONS | NON-EXEMPT VALUE | | |
|---|---|---|---|---|---|---|---|---|
| CASH on hand (projected Effective Date 6/14/23) | $343,000.00 | | | | | $343,000.00 | $343,000.00 | 1 |
| Preference Claim | $470,000.00 | | | | $0.00 | $470,000.00 | $470,000.00 | 6 |
| Accounts Receivable | $0.00 | | | | $0.00 | $0.00 | $0.00 | 2 |
| Misc Office Furniture | $10,000.00 | | | | $0.00 | $10,000.00 | $7,500.00 | 3 |
| Intellectual Property | $0.00 | | | | | $0.00 | $0.00 | 5 |

| | | |
|---|---|---|
| TOTAL AVAILABLE FROM POTENTIAL CHAPTER 7 LIQUIDATION | $820,500.00 | |
| Chapter 7 Trustee Compensation | $44,275.00 | (4) |
| TOTAL POTENTIAL CHAPTER 7 DISTRIBUTION | $776,225.00 | |

Notes:

Note 1: All values are estimated based on projected values on the Effective Date of the Plan.

Note 2: Accounts receivable are paid in advance for continued services rendered.

Note 3: Liquidation value of personal property assumes a 25% discount and transaction cost.

Note 4: Chapter 7 Trustee fees are calculated using the standard Trustee fee calculation

Note 5: Intellectual property consists of website and database; database is licensed and website is valueless without the database.

Note 6: Value of preference claim is based on approval of pending compromise which returns approximately $235k to the estate.

Idaho Health Data Exchange HYPOTHETICAL LIQUIDATION ANALYSIS (Chapter 7 w/Cureous Settlement)

| REAL PROPERTY | FMV | 1ST DOT | 2ND DOT | OTHER LIENS | EXEMPTIONS | NON-EXEMPT EQUITY | LIQUIDATION VALUE TO CH. 7 ESTATE | Notes |
|---|---|---|---|---|---|---|---|---|
| None | $0.00 | | | | $0.00 | $0.00 | $0.00 | |

| OTHER REAL PROPERTY | FMV | 1ST DOT | 2ND DOT | | EXEMPTIONS | NON-EXEMPT EQUITY | | |
|---|---|---|---|---|---|---|---|---|
| None | $0.00 | | | | $0.00 | $0.00 | $0.00 | |

| BUSINESSES | VALUE OF DEBTOR'S INTEREST | | | | EXEMPTIONS | NON-EXEMPT VALUE | | |
|---|---|---|---|---|---|---|---|---|
| None | $0.00 | | | | $0.00 | $0.00 | $0.00 | |

| PERSONAL PROPERTY | FMV | | | | EXEMPTIONS | NON-EXEMPT VALUE | | |
|---|---|---|---|---|---|---|---|---|
| CASH on hand (projected Effective Date 6/14/23) | $343,000.00 | | | | | $343,000.00 | $343,000.00 | 1 |
| Preference Claim | $235,000.00 | | | | $0.00 | $235,000.00 | $235,000.00 | 6 |
| Accounts Receivable | $0.00 | | | | $0.00 | $0.00 | $0.00 | 2 |
| Misc Office Furniture | $10,000.00 | | | | $0.00 | $10,000.00 | $7,500.00 | 3 |
| Intellectual Property | $0.00 | | | | | $0.00 | $0.00 | 5 |

| | | |
|---|---|---|
| TOTAL AVAILABLE FROM POTENTIAL CHAPTER 7 LIQUIDATION | $585,500.00 | |
| Chapter 7 Trustee Compensation | $32,525.00 | (4) |
| TOTAL POTENTIAL CHAPTER 7 DISTRIBUTION | $552,975.00 | |

Notes:
Note 1: All values are estimated based on projected values on the Effective Date of the Plan.
Note 2: Accounts receivable are paid in advance for continued services rendered.
Note 3: Liquidation value of personal property assumes a 25% discount and transaction cost.
Note 4: Chapter 7 Trustee fees are calculated using the standard Trustee fee calculation
Note 5: Intellectual property consists of website and database; database is licensed and website is valueless without the database.
Note 6: Value of preference claim is based on settlement with Cureous being approved.

| Creditor | Amount | Claim No. | C/U/D? | Disputed? |
|---|---|---|---|---|
| 4Medica | $ - | | | |
| Amazon Web Services | $ - | | | |
| Briljent | $ 15,500.00 | | | |
| C2 Consulting | $ 80,000.00 | 1 | | |
| Capitol Health Associates | $ 202,421.04 | | | |
| Cureous Innovations | $ 958,110.54 | 2 | U/D | Yes |
| Health System Transformation | $ 78,252.34 | | | |
| KPI Ninja | $ 213,000.00 | | | |
| Orion Health | $2,281,200.43 | 3 | | |
| Paramount Consulting | $ - | | | |
| PointCare | $ 80,330.00 | | | |
| Primus Policy Group | $ 5,000.00 | | | |
| SPUR Catalyst | $ 334,531.37 | 5 | U/D | |
| | | | | |
| TOTAL | $ 4,248,345.72 | | | |
| TOTAL (w/o Cureous) | $ 3,290,235.18 | | | |
| | | | | |
| Other clients repayments (based on prepaid services) | $380,210.00 | | | |
| Total (with everyone) | $ 4,628,555.72 | | | |
| Total (w/o Orion or other clients) | $ 1,967,145.29 | | | |
| Total (w/o Cureous Secured Claim) | $ 4,158,555.72 | | | |
| Total (w/o Cureous) | $ 3,670,445.18 | | | |
| Total (w/o Cureous, Orion or other clients) | $ 1,009,034.75 | | | |

| Recovery Analysis (w/o CI Settlement) | |
|---|---|
| | |
| Liquidation payments (assumes recovery of CI $): | $ 776,225.00 |
| Liquidation payments (no recovery of CI $) | $306,225.00 |
| Plan payments to General unsecured: | $ 240,000.00 |
| | |
| Projected percentage (liquidation⌋ | 17% |
| Projected percentage (liquidation w/o CI$) | 7% |
| Projected percentage (Plan) | 12% |
| | |

| Recovery Analysis (w/ CI Settlement) | |
|---|---|
| | |
| Liquidation payments (assumes recovery of some CI$)] | $ 552,975.00 |
| Plan Payments to General Unsecured: | $ 240,000.00 |
| | |
| Projected percentage (liquidation⌋ | 15% |
| Projected percentage (Plan) | 24% |

Notes: 4Medica and Amazon Web Services were paid as continuing contracts; Paramount Consulting has waived any pre-petition claim against Debtor